IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ADIDAS-SALOMON AG and ADIDAS | ) | |
| AMERICA, INC., | ) | |
| | ) | CV-01-1582-ST |
| Plaintiffs, | ) | |
| | ) | FINDINGS AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| TARGET CORP.; E.S. ORIGINALS, INC.; and | ) | |
| B.U.M. INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

On October 25, 2001, plaintiffs, adidas-Salomon AG and adidas America, Inc. (collectively,

"adidas") filed this action against defendants, Target Corporation ("Target"), E.S. Originals, Inc. ("E.S.

Originals") and B.U.M. International, Inc. ("B.U.M.").  adidas alleges that

defendants have offered for sale and sold shoes[1] with four stripes and other features that bear confusingly similar imitations of adidas' "Three Stripe Mark" and "Original Superstar Trade Dress"[2] in violation of various state and federal laws, including the federal Lanham Trademark Act ("Lanham Act"), 15 USC §§ 1051-1127.

adidas alleges a total of nine claims for relief for: (1) federal trademark infringement of the Three Stripe Mark in violation of 15 USC § 1114 (First Claim for Relief); (2) federal unfair competition and dilution in violation of 15 USC § 1125(a) and (c) as to the Three Stripe Mark (Second and Fourth Claims for Relief) and the Original Superstar Trade Dress (Third and Fifth Claims for Relief); (3) state trademark dilution and injury to business reputation in violation of ORS 647.107 and various other states' laws (Complaint, ¶¶ 61, 65, and 67) as to the Three Stripe Mark (Sixth Claim for Relief) and as to the Original Superstar Trade Dress (Seventh Claim for Relief); (4) common law trademark infringement and unfair competition as to the Three Stripe Mark (Eighth Claim for Relief); and (5) unfair and deceptive trade practices in violation of ORS 646.605-.656 and the unfair and deceptive trade practices statutes of other states as to the Three Stripe Mark (Complaint, ¶ 72) (Ninth Claim for Relief).

---

[1] The specific shoe models about which adidas complains are E.S. Originals' Pro Sprit Vega and Pro Spirit Von, and B.U.M.'s Jonah and Mikal models.

[2] adidas titles the allegedly protected trade dress as the "SUPERSTAR Trade Dress." Complaint, ¶ 18. Defendants initially argued that a "SUPERSTAR Trade Dress" does not exist because all elements of the trade dress are not used consistently by adidas. Specifically, defendants pointed out that many "Superstar" shoes do not have a flat sole, a colored portion on the back of the heel, and the so-called "shell toe." However, adidas has now clarified that the subject of this dispute is a specific shoe in its "Originals" line which incorporates all of the Original Superstar Trade Dress elements alleged by adidas, namely the Original Superstar shoe. Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, p. 17; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶¶ 1, 2. This court thus refers to that relevant trade dress as the "Original Superstar Trade Dress."

This court has jurisdiction over adidas' federal claims under the Lanham Act, 15 USC § 1121(a), and 28 USC §§ 1331 and 1338(a), and supplemental jurisdiction over the related claims under 28 USC §§ 1338(b) and 1367. Defendants Target and B.U.M.[3] filed a Motion to Dismiss (docket #22), which this court has converted to a motion for summary judgment pursuant to FRCP 12(b). *See* Minute Order (docket #47).

For the reasons that follow, defendants' motion for summary judgment (docket #22) should be denied.

## ANALYSIS

### I. Legal Standard for Motions for Summary Judgment

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324. A "'scintilla of evidence,'" or evidence that is "'merely colorable' or not 'significantly probative,' does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (citations omitted).

---

[3] E.S. Originals filed an Answer on December 5, 2001, and did not join in the Motion to Dismiss filed by Target and B.U.M. For simplicity, this court refers to Target and B.U.M. as "defendants" throughout the remainder of this Findings and Recommendation.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631-32 (9th Cir 1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. *Dethmers Mfg. Co., Inc. v. Automatic Equipment Mfg., Co.*, 272 F3d 1365, 1369 (Fed Cir 2001); *Bayer AG v. Elan Pharmaceutical Research Corp.*, 212 F3d 1241, 1247 (Fed Cir), *cert denied*, 531 US 993 (2000). Additionally, "[b]ecause of the intensely factual nature of trademark disputes summary judgment is generally disfavored in the trademark arena." *Interstellar Starship Servs., Ltd. v. Epix, Inc.* ("*Interstellar Starship*"), 184 F3d 1107, 1109 (9th Cir 1999), citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F2d 1352, 1356 n5 (9th Cir 1985) (*en banc*).

## II.  Factual Background

While defendants and adidas have submitted factual statements, they have also opposed virtually every fact in their opponent's statement. For contextual purposes only, the following is a brief statement of the history of the present lawsuit:

adidas is a German company and an American subsidiary that manufacture and distribute athletic footwear, sportswear, and sporting equipment. adidas owns a "Three Stripe Mark" for athletic footwear consisting of three parallel diagonal bands, covered by US Registration Nos. 961,353 issued June 19, 1973 (Complaint, ¶ 14 and Ex 4, p. 2), 1,815,956 issued January 11, 1994 (*id*, ¶ 12 and Ex 2), and 1,833,868 issued May 3, 1994 (*id*, ¶ 13 and Ex 3). Among its many different models of athletic shoes, adidas manufactures and sells a shoe model called the "Campus II J" which bears the

Three Stripe Mark.  Jorgenson Dec,[4]  Ex 2.  However, adidas manufactures and sells some shoes that do not bear the Three Stripe Mark.

adidas claims protected rights in the Original Superstar Trade Dress, which consists of: (1) three stripes on the side of the shoe parallel to equidistant small holes; (2) a rubber "shell toe;" (3) a particularly flat sole; and (4) a colored portion on the outer back heel section (referred to by the parties as a "heel patch" or "color moustache").  Complaint, ¶ 18.  adidas manufactures and sells a line of shoes called the "Originals" line, several of which bear the Original Superstar Trade Dress.  Amended Jorgenson Dec., ¶¶ 31-32.  Shoes in the Originals line are manufactured and sold under various names including "Superstar," "Superstar II" and "Superstar II K."  Adler Dec, Exs 3 & 4.

Shoes bearing the Original Superstar Trade Dress were first sold in 1969 as a basketball shoe and the principal elements of the Original Superstar Trade Dress have not changed since that time.  All shoes sold under the "Superstar" name, including those shoes bearing the Original Superstar Trade Dress, bear the Three Stripe Mark.  Shoes bearing the Original Superstar Trade Dress have varying suggested retail prices, depending on a number of factors, including, among others, whether the shoe is in an adult's or child's size.

Target is an operator of mass market retail stores.  Complaint, ¶ 22.  B.U.M. licenses sport shoes bearing a four stripe design under the model names "Jonah" and "Mikal" which are sold by Target at its retail outlets for $12.99 and $14.99, respectively.  *Id*, ¶ 24; Adler Dec, Exs 2 ("Jonah" model) & 1 ("Mikal" model).  B.U.M. owns the federally registered trademarks "b.u.m.," "B.U.M.

---

[4] Excerpts from affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript.

Footwear," "b.u.m. equipment," "BUM," and "B.U.M."  B.U.M. is well-known for its casual clothing and shoes.  Target does not sell adidas shoes.

### III.  Preliminary Issue Relating to Trade Dress Claims

Initially, this court must clarify an issue discussed but not resolved at oral argument.  At the hearing, this court questioned whether adidas was asserting a trade dress claim relating to its Campus model shoe against defendants' Mikal model shoe.  The Campus model shoe displays the Three Stripe Mark, but does not incorporate the rubber shell toe, which is one of the four elements identified by adidas as constituting its Original Superstar Trade Dress.  Although adidas' counsel responded affirmatively, a review of the pleadings and the briefing reveals that no such claim is presently alleged or being pursued by adidas.

As discussed in more detail below, the Ninth Circuit has cautioned that when analyzing the "elements of a trade dress claim, it is crucial that we focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards, Inc. v. Six Shooters, Inc.*, 251 F3d 1252, 1259 (9th Cir 2001) (emphasis in original).  Thus, any reasoned analysis of adidas' trade dress infringement claims begins with an evaluation of the exact trade dress adidas alleges has been infringed:

> Whatever may be claimed as the combination of elements making up the product or its packaging and presentation, . . . it will not do to solely identify in litigation such a combination as "the trade dress." Rather, the discrete elements which make up the combination should be separated out and identified on a list.  Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.

6 - FINDINGS AND RECOMMENDATION

McCarthy, J. Thomas, McCarthy on Trademark and Unfair Competition ("McCarthy"), § 8.3 (4th ed 2001).

The Original Superstar Trade Dress in which adidas claims a protectable interest includes four elements, namely: (1) three stripes on the side of the shoe parallel to equidistant small holes; (2) a rubber shell toe; (3) a particularly flat sole; and (4) a heel patch. Complaint, ¶ 18. In addition, the Complaint places a heavy emphasis on the fame and popularity of the rubber shell toe as a defining feature of the trade dress it seeks to protect. *Id*, ¶ 20.

That said, it is undisputed that defendants' Mikal model shoe has no rubber toe, much less one that can be characterized as a "shell toe." Moreover, adidas acknowledges that it does not claim that the Mikal model is a knock-off of the Superstar Originals (*i.e.* of shoes bearing the Original Superstar Trade Dress), but only claims that the Mikal model infringes the Three Stripe Mark and "also happens to be a direct knock-off" of adidas' Campus model. Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, pp. 22-23, n17. Thus, this court is baffled by the statement by adidas' counsel at oral argument that it *does* assert a trade dress claim with respect to the Campus model shoe. Hearing Transcript, p. 4. The Complaint simply does not allege that the Mikal shoe infringes the Original Superstar Trade Dress.

In short, adidas simply has not alleged infringement based on the trade dress (as opposed to the Three Stripe Mark) of the Campus shoe. Thus, to the extent that defendants seek summary judgment against any such claim against the Mikal model shoe, their motion should be denied as moot. Given the absence of such a claim, this court expresses no opinion on its viability should adidas seek to add it.

## IV. <u>Trademark Infringement and Unfair Competition Claims</u>

7 - FINDINGS AND RECOMMENDATION

**(First, Second, Third, and Eighth Claims for Relief)**

Having dispensed with this preliminary issue, this court now turns to adidas' various claims and the challenges raised by defendants.[5]  Four of adidas' nine claims (the First through Third, and Eighth Claims) allege infringement and unfair competition with respect to adidas' Three Stripe Mark and Original Superstar Trade Dress.  These claims raise legal issues which are closely related and, in some cases, identical.  The common theme is that adidas has a protectable interest in the Three Stripe Mark and the Original Superstar Trade Dress, and that the markings and trade dress displayed on defendants' shoes are sufficiently similar to adidas' shoes such that they infringe on adidas' trademark and trade dress.

**A.  Legal Standards**

Trademark law is a species of the "generic concept" that the common law protects against the "broad business tort of 'unfair competition.'"  *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F2d 912, 915 (9th Cir 1980), *cert denied*, 452 US 941 (1981) (citation omitted).  The Lanham Act "created a federal protection against two types of unfair competition, infringement of registered trademarks . . . and the related tort of false designation of the origin of goods."  *Id* (citations omitted).

A claim for federal trademark infringement lies against any person who, without the consent of the holder of the registered trademark:

> use[s] in commerce any reproduction, counterfeit, copy or colorable
> imitation of a registered mark in connection with the sale, offering for

---

[5] Because the parties do not separately address each claim, this court will follow suit and address them categorically.

> sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 USC § 1114(1)(a).

Additionally, a person incurs civil liability under federal law for unfair competition by using in commerce "any word, term, name, symbol, or device, or any combination thereof, . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the . . . origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 USC § 1125(a).  Trade dress is accepted as a "symbol" or "device" for purposes of protection under this provision of the Lanham Act.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.* ("*Wal-Mart*"), 529 US 205, 209 (2000).

"To state an infringement claim under [15 USC § 1125(a)] — whether it be a trademark claim or a trade dress claim — a plaintiff must meet three basic elements: (1) distinctiveness; (2) nonfunctionality; and (3) likelihood of confusion.  *Kendall-Jackson Winery, Ltd.  v. E & J Gallo Winery*, 150 F3d 1042, 1046-47 (9th Cir 1998); *see also Wal-Mart*, 529 US at 210; *Clicks Billiards*, 251 F3d at 1258.

The ultimate test for unfair competition is exactly the same as for federal trademark infringement, that is "whether the purchaser is likely to be deceived or confused by the similarity of the marks." *Interstellar Starship*, 184 F3d at 1110.  However, claims for unfair competition through the simulation of trade dress may involve a broader range of inquiry than do claims for trademark infringement:

9 - FINDINGS AND RECOMMENDATION

The emphasis and thrust of trademark protection is in the direction of deciding whether an alleged symbol in fact functions to identify and distinguish the goods or services of one seller. . . .  In trademark law, therefore, it is only the exclusive symbol characterized as a "trademark" that is juxtaposed against another's usage to determine whether or not the two uses by two sellers are likely to confuse customers.

On the other hand, unfair competition through the simulation of trade dress is not so limited in scope.  Liability can result from the buyer's likely confusion between two products or services based upon the total impact of all aspects of the parties' selling efforts.  The scope of what the alleged trade dress consists of is largely defined by plaintiff's counsel in litigation and can range from the overall appearance of packaging to the actual design and shape of the product itself. . . .

In unfair competition law, everything that is likely to have an impact on the purchaser might be relevant to the ultimate determination of whether there is probable "unfairness" or confusion by the purchaser.

\*          \*          \*

[E]ven in the traditional similarity of appearance case, the scope of consideration under unfair competition law is much greater than under the more technical and limited area of trademark infringement law.

MCCARTHY, § 2.7.

B.  __Defendants' Challenges to adidas' Claims__

As discussed in more detail below, defendants raise three basic issues, each of which touches on several of adidas' claims.  Defendants argue that adidas cannot show that the Original Superstar Trade Dress is nonfunctional or distinctive.  They also argue there is no likelihood of confusion between: (1) the four stripe mark displayed on the B.U.M. shoes and the Three Stripe Mark displayed on adidas' shoes; or between (2) the trade dress displayed on the B.U.M. shoes (displayed on the Jonah

model B.U.M. shoes) and that of the Original Superstar Trade Dress (displayed on the Superstar II K model adidas shoes).  For the reasons that follow, each of these arguments should be rejected.

### 1.  Nonfunctionality

#### a.  Legal Standard

"The requirement of nonfunctionality is based 'on the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws.'"  *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F3d 1009, 1011-12 (9th Cir 1999), quoting *In re Morton-Norwich Prods., Inc.* ("*Morton-Norwich*"), 671 F2d 1332, 1336 (CCPA, February 18, 1982) (emphasis omitted).  This requirement is designed to encourage competition and the broadest dissemination of useful design features.

"Functional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product."  *Rachel v. Banana Republic, Inc.*, 831 F2d 1503, 1506 (9th Cir 1987) (internal quotation marks and citation omitted).  Functionality is a question of fact on which the plaintiff in an infringement action bears the burden of proof.  *Clicks Billiards*, 251 F3d at 1258 (citations omitted); *HWE, Inc. v. JB Research, Inc.*, 993 F2d 694, 696 (9th Cir 1993), citing *Rachel*, 831 F2d at 1506.  Functionality has two alternative design features:

> "In general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," that is, if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage."

*Qualitex Co. v. Jacobson Prods. Co.*, 514 US 159, 165 (1995), quoting *Inwood Labs., Inc. v. Ives*

*Labs, Inc.*, 456 US 844, 850 n10 (1982); *see also TrafFix Devices, Inc. v. Marketing Displays,*

*Inc.*, 532 US 23, 32 (2001) (citing *Qualitex* and *Inwood* with approval).

A design feature of a particular article is "essential" only if the feature is dictated by the

functions to be performed; a feature that merely accommodates a useful function is not enough.

*Morton-Norwich*, 671 F2d at 1342 (shape of plastic container for spray products not essential to its

purpose as a sprayer). A design feature "affecting the cost or quality of an article" is one which permits

the article to be manufactured at a lower cost. *E.g., Kellogg Co. v. National Biscuit Co.*, 305 US

111, 122 (1938) (pillow shape of shredded wheat biscuit functional as cost would be increased and

quality lessened by other form), or one which constitutes an improvement in the operation of the goods,

*e.g., Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F2d 193, 195 (1st Cir 1980)

(two-tier design of woodstove functional because improving the operation of the stove in three

respects).

The Ninth Circuit has all but rejected the concept of "aesthetic functionality," *Clicks Billiards*,

251 F3d at 1260 (citations omitted), and instead considers four factors when determining whether

features of a product are functional: "(1) whether the design yields a utilitarian advantage, (2) whether

alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design,

and (4) whether the particular design results from a comparatively simple or inexpensive method of

manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F3d 1002, 1006 (9th Cir 1998).

### b. Analysis

### 1. The Three Stripe Mark

Defendants admit that the Three Stripe Mark is not functional.   Reply, p. 8.

## 2.  **The Original Superstar Trade Dress**

With respect to the Original Superstar Trade Dress, defendants concede both the

nonfunctionality of the Three Stripe Mark (*id*) and the heel patch (Hearing Transcript, p. 17).  Instead,

defendants argue that the flat sole and rubber shell toe are widely used throughout the shoe industry and

therefore are functional elements which render the Original Superstar Trade Dress functional.

However, it is inappropriate to parse out individual elements as being functional elements of the alleged

trade dress:

> A defendant cannot avoid liability . . . simply by segregating out the
> various aspects of plaintiff's product, packaging, and labels and
> claiming that no one of these is protectable in and of itself.  It is the total
> combination of elements that is at issue.
> *            *            *
> Trade dress protection focuses on the plaintiff's "entire selling image,
> rather than the narrower single facet of trademark."  Or as another
> judge put it, "the *tout ensemble* of the article as it appears to the
> average buyer is to be considered."

McCarthy § 8.2, quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F2d 609, 613 (9th Cir 1989)

(footnotes and additional citations omitted); *see also Clicks Billiards*, 251 F3d at 1259 ("Trade dress

is the composite tapestry of visual effects.

Courts have repeatedly cautioned that, in trademark – and especially [in] trade dress-cases, the

mark must be examined as a whole, not by its individual constituent parts"); *Fuddruckers, Inc. v.

Doc's B.R. Others, Inc.*, 826 F2d 837, 842 (9th Cir 1987) ("functional elements that are separately

unprotectable can be protected together as part of a trade dress").  In short, unequivocal Ninth Circuit

13 - FINDINGS AND RECOMMENDATION

authority requires this court to reject defendants' "divide and conquer" approach to adidas' trade dress claims. All the elements of adidas' alleged Original Superstar trade dress must stand or fall together.

Defendants also point out several cases noting that many other shoe manufacturers commonly use strips, stripes, and bars on the sides of their shoes. *In Re The Lucky Co*, 209 USPQ 422 (TTAB, April 30, 1980); *Puma-Sportschuhfabriken Rudolph Dassler KG v. Superga SPA*, 210 USPQ 316 (TTAB, February 21, 1980). As a result, they fear that adidias will have a monopoly over stripe designs if its trade dress claims are allowed to proceed. This fear is unfounded. The Ninth Circuit has expressly rejected the argument that protection of a trade dress consisting of several functional elements results in a monopoly protection for elements competitors might wish to use:

///

> Viewing the elements as a whole does not result in monopoly protection for necessary elements. If Fuddruckers were to get protection for its trade dress, which includes such items as directors chairs, white tile, and an open bakery, it could not preclude other restaurants from using those items. It can only prevent competitors from using the items in a way that, viewed as a whole, is likely to confuse consumers. There are many ways to use directors chairs, white tile, open bakeries, and the many other items that make up Fuddruckers' trade dress that would not cause confusion.

*Fuddruckers*, 826 F2d at 842, n7 (citations omitted).

As in *Fuddruckers*, adidas may not prevent competitors from using strips, stripes, or bars, or from incorporating heel patches, flat soles, or rubberized toes into their shoe designs. However, it can prevent competitors from using those elements in a way that, viewed as a whole, is likely to cause confusion.

14 - FINDINGS AND RECOMMENDATION

Defendants also insist that adidas cannot meet its burden of proving nonfunctionality simply by including some admittedly nonfunctional features (*i.e.* the heel patch and Three Stripe Mark) as elements of its trade dress claim, citing *TraFfix* and *Leatherman*.  However, neither *TraFfix*, nor *Leatherman* support that argument.

*TraFfix* involved a trade dress claim based on a single element, namely a "dual-spring design" incorporated into temporary road signs that had to withstand strong gusts of wind.  *TraFfix*, 532 US at 23.  The Court found that "the dual-spring design provides a unique and useful mechanism to resist the force of the wind," and consequently found that single design feature functional.  *Id* at 33.  Unlike *TraFfix*, this case does not involve a trade dress consisting of a single functional design feature.

///

///

In *Leatherman*, there was "no evidence . . . that anything about [the appearance of the plaintiff's pocket tool] (other than the Leatherman name) exists for any non-functional purpose.  Rather, every physical part of the Leatherman is *de jure* functional," meaning that it has its particular shape because that shape works better.  *Leatherman*, 199 F3d at 1012-13.  The court concluded that because the trade dress was "nothing more than the assemblage of functional parts, and [that the] arrangement and combination of the parts is designed to result in superior performance," it would be "semantic trickery to say that there is still some sort of separate but 'overall appearance' which is nonfunctional."  *Id*.  Unlike *Leatherman*, this case does not involve a trade dress consisting simply of a grouping of functional elements whose overall appearance is a nonfunctional trade dress.  Instead, what adidas seeks to protect is the overall appearance of its Original Superstar Trade Dress, which includes

15 - FINDINGS AND RECOMMENDATION

four identified elements, two of which defendants admit are nonfunctional, and two of which defendants

contend are functional.

Defendants further argue that shoes incorporating the Original Superstar Trade Dress were

originally designed and manufactured in the late 1960s, and are still sold and advertised, as

performance basketball shoes. According to defendants, the flat sole improves the performance and

the shell toe makes the shoes more durable. Even if they have since developed attractiveness as a

fashion statement, defendants contend that these elements of the Original Superstar Trade Dress retain

their utilitarian function. This argument again improperly focuses only on two of the elements of the

Original Superstar Trade Dress (the flat sole and shell toe). But even assuming that it is appropriate to

focus only on these two elements functionality is a fact-specific status that may change over time. "Even

though a configuration has been held functional, its status may later change to become non-functional."

McCarthy, § 7:63, citing *In re Zippo Mfg. Co.*, 50 USPQ2d 1852 (TTAB, March 23, 1999); *see*

*also In Re Honeywell, Inc.*, 1988 WL 252417, *6 (TTAB, Aug 16, 1988). adidas has presented

evidence that, although the Original Superstar Trade Dress initially was designed as a performance

basketball shoe, by today's standards, the flat sole feature of the Original Superstar Trade Dress is no

longer considered optimal for performance. Amended Jorgenson Dec, ¶ 40.

Furthermore, adidas has submitted sufficient evidence of nonfunctionality of three of the four

trade dress elements to avoid summary judgment. Specifically, according to adidas, the Three Stripe

Mark does not increase the durability or performance of the shoes. *Id*, ¶ 25. In addition, the shell toe

feature adds no elements of durability or performance of the shoes, but is purely ornamental and

16 - FINDINGS AND RECOMMENDATION

actually increases the production cost. *Id*, ¶ 39. And, as noted above, the flat sole arguably serves to decrease performance by modern footwear standards. *Id*, ¶ 40.

Other than their own unsupported assertions, defendants have failed to submit any evidence that the design of the Original Superstar Trade Dress yields a utilitarian advantage, that advertising touts the utilitarian advantages of the design, or that the design results from a comparatively simple or inexpensive method of manufacture. Defendants also have not responded to the obvious problem that while a rubberized toe might make the shoe more durable, the stylized "shell" design serves no utilitarian purpose.

Although limited, the evidence in the record which this court must interpret in adidas' favor, supports the inference that a multitude of design alternatives are available to other shoe manufacturers (*see*, *e.g.*, *Puma* and *In Re The Lucky Company*) and that, rather than simplifying manufacture or decreasing production costs, the Original Superstar Trade Dress increases the production cost. Thus, to the extent that defendants' motion rests on an argument that the Three Stripe Mark or the Original Superstar Trade Dress are functional, it should be rejected.

### 2. **Distinctiveness: Acquired or Secondary Meaning**

#### a. **Legal Standard**

Although nothing in the Lanham Act explicitly requires a showing that a trade dress is distinctive, "courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods,'" as the section requires. *Wal-Mart*, 529 US at 210 (citation omitted).

17 - FINDINGS AND RECOMMENDATION

"An identifying mark is distinctive and is capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 US 763, 769 (1992). A mark is inherently distinctive:

> if "[its] intrinsic nature serves to identify a particular source." In the context of word marks, courts have applied the now-classic test originally formulated by Judge Friendly, in which word marks that are "arbitrary" ("Camel" cigarettes), "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry detergent) are held to be inherently distinctive.

*Wal-Mart*, 529 US at 210-11 (citations omitted).

Even if not inherently distinctive, a mark acquires distinctiveness "if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.' *Id* at 211 (citations omitted). In the Ninth Circuit, secondary meaning is defined merely as "association" and has as its "basic element . . . the mental association by a substantial segment of consumers and potential consumers 'between the alleged mark and a single source of the product.'" *Levi Strauss & Co.*, 778 F2d at 1354, quoting McCarthy, §§ 15:2 and 15:11(B) (additional citations omitted).

Whether a symbol or device has acquired secondary meaning is a question of fact. *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F2d 1240, 1246 (9th Cir 1984), *cert denied*, 469 US 1188 (1985) (citation omitted).

### b. **Analysis**

#### 1. **The Three Stripe Mark**

18 - FINDINGS AND RECOMMENDATION

It is undisputed that adidas' Three Stripe Mark is the subject of incontestable federal registrations. Complaint, ¶¶ 12-13. Incontestable registrations constitute "conclusive evidence" that a trademark is distinctive. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 US 189, 205 (1985). Thus, defendants are precluded from arguing that adidas' claims for infringement of the Three Stripe Mark fail for lack of secondary meaning.

### 2. Original Superstar Trade Dress

#### a. "Product Packaging" vs. "Product Design"

An initial disagreement between the parties is whether the Original Superstar Trade Dress should be characterized as "product packaging" or "product design." The proper characterization determines whether proof of secondary meaning is required.

A decade ago in *Two Pesos*, *supra*, the Supreme Court held that proof of acquired distinctiveness or secondary meaning is not required for protection of inherently distinctive trade dress. The Court did not articulate how to determine whether a particular trade dress is inherently distinctive, nor did the Court distinguish any particular type of trade dress (product packaging or product design for instance) that can or cannot be inherently distinctive. In the wake of *Two Pesos*, the Circuits split on the issue of which analysis should be used to determine inherent distinctiveness. *Compare Ashley Furniture Indus., Inc. v. Sangiacomo N.A. Ltd.*, 187 F3d 363, 371 (4th Cir 1999) (applying "spectrum of distinctiveness" analysis first articulated in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F2d 4, 9 (2nd Cir 1976)) *with I.P. Lund Trading ApS v. Kohler Co.*, 163 F3d 27, 40, 49 (1st Cir 1998) (applying test articulated in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F2d 1342, 1344 (CCPA, December 22, 1977)). In 2000, the Supreme Court narrowed the split

19 - FINDINGS AND RECOMMENDATION

somewhat by determining that product design trade dress cannot be inherently distinctive and therefore always requires proof of acquired distinctiveness or secondary meaning. *Wal-Mart,* 529 US at 216.

Predictably, the parties in this case dispute whether the Original Superstar Trade Dress constitutes product design (as argued by defendants) or product packaging (as argued by adidas). Attempting to apply the *Wal-Mart* analysis yields no clear answer on this point, nor does the approach suggested by MCCARTHY, § 8:12.1 (criticizing the test articulated in *Wal-Mart* as "too subjective and speculative a method of distinguishing product from packaging" and advocating a "purely physical analysis"). As with the hypothetical Coke-drinking or Coke-bottle collecting consumers identified in *Wal-Mart*, a consumer might choose to purchase shoes bearing the Original Superstar Trade Dress for any variety of reasons. One consumer might simply need a pair of shoes for the utilitarian purpose of foot protection, while another might find it more stylish to wear shoes bearing the Original Superstar Trade Dress. When faced with this conundrum, the Supreme Court has directed that "courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Wal-Mart*, 529 US at 215.

///

This court will follow that admonishment and take the cautious approach of treating the Original Superstar Trade Dress as product design trade dress that is incapable of being inherently distinctive. Thus, the Original Superstar Trade Dress requires proof of secondary meaning.

**b. <u>Secondary Meaning</u>**

20 - FINDINGS AND RECOMMENDATION

Defendants assert that adidas has failed to submit sufficient evidence that the Original Superstar Trade Dress has attained acquired distinctiveness, or secondary meaning, and that therefore all the claims premised on that trade dress fail. This court disagrees.

Trade dress acquires secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Qualitex,* 514 US at 163, quoting *Inwood,* 456 US at 851 n11. When deciding whether secondary meaning exists for a particular trade dress, courts consider such things as: (1) whether actual purchasers associate the dress with the source; (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use of the dress, and (4) whether the use by the party seeking protection has been exclusive. *See Clamp Mfg. Co. v. Enco Mfg. Co.,* 870 F2d 512, 517 (9th Cir), *cert denied*, 493 US 872 (1989). Other considerations such as sales success and attempts by others to imitate the mark also favor finding secondary meaning. *See Clicks Billiards*, 251 F3d at 1266; *Mana Prods., Inc. v. Columbia Cosmetics Mfg.,* 65 F3d 1063, 1071 (2nd Cir 1995).

Defendants strenuously argue that the secondary meaning of the Three Stripe Mark must be ignored when evaluating adidas' claims of trade dress infringement. However, neither of the cases upon which defendants rely stand for that proposition. In *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F3d 863, 873 (8th Cir 1994), the trade dress at issue "was the combination of natural-looking potpourri packaged in a pillow-shaped, doubled cellophane bag whose opening was gathered and tied with cords with a hanging tag attached thereto," and secondary meaning of "Aromatique's other registered and unregistered marks [was] not at issue." In *San Fransisco Mercantile Co., Inc. v. Beeba's Creations, Inc.,* 704 F Supp 1005, 1006, 1009 (CD Cal 1988), the trade dress was "individual elements making

21 - FINDINGS AND RECOMMENDATION

up the [Victorian] 'look' [of the lingerie, including] the lace, the cotton fabric, buttons, etc.," and  "use

of the name 'QAL'" was not at issue).

In contrast, numerous cases address trade dress claims which include registered trademarks.

*See, e.g.*, *Vision Sports*, 888 F2d at 613-14 (trade dress included VSW mark); *LeSportsac, Inc. v.*

*K Mart Corp.*, 754 F2d 71, 76 (9th Cir 1985) (trade dress in bags included the repeating trademark

LeSportsac on the trim); *Hard Rock Licensing Corp. v. Pacific Graphics, Inc.*, 776 F Supp 1454,

1460 (WD Wash 1991) ("Where, as here, the graphic elements that might otherwise be considered

trade dress are part of a registered trademark, that mark should also be entitled to the broader

protection afforded to trade dress").

Given that the Three Stripe Mark cannot be ignored, adidas has submitted sufficient evidence

to establish secondary meaning of the Original Superstar Trade Dress to overcome summary judgment.

Secondary meaning can be shown through varying types of circumstantial evidence, including

exclusivity, length and manner of use, amount and manner of advertising, amount of sales and number of

customers, having an established place in the market, and proof of intentional copying.  MCCARTHY, §

15:30 (collecting cases).  The amount, nature, and geographical scope of advertising is relevant to the

distinctiveness inquiry.  *See, e.g.*, *Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F3d 866,

875 (9th Cir 2002) (citation omitted).  adidas has submitted some of this type of evidence.

adidas has had exclusive use of the Original Superstar Trade Dress since the late 1960s for

which it has expended significant resources promoting the product and its appearance. Amended

Jorgenson Dec, ¶¶ 7-9, 31, 36-38.  Its advertising includes traditional television and print advertising,

sponsorships, active product placement, and cooperative brand advertisements.  The materials

22 - FINDINGS AND RECOMMENDATION

submitted by adidas do not specify the exact amount adidas has spent specifically promoting the

Original Superstar Trade Dress, and do not specify the exact geographical scope of such advertising.

However, adidas' materials indicate that, at a minimum, their advertising and related research spans the

United States (*id*, ¶¶ 4 (research), 20 (sponsoring Boston Marathon), 22 (sponsoring United States

Youth Soccer) 37 (product placement), and 38 (cooperative brand advertising with United States

retailers)), resulting in significant sales throughout the United States. *Id*, ¶¶ 27, 35.[6]  The sales figures

provided for adidas shoes bearing the Original Superstar Trade Dress are sufficiently large that they are

significant to the question of secondary meaning.  *See*, *e.g.*, *Transgo, Inc. v. Ajac Transmission Parts

Corp.*, 768 F2d 1001, 1016 (9th Cir 1985), *cert denied*, 474 US 1059 (1986) (sales in excess of $5

million).

     Defendants complain that adidas has not done any image advertising in the sense that

consumers are directed to "look for" the Original Superstar Trade Dress.  However, adidas has done

some image advertising.  Amended Jorgenson Dec, ¶¶ 7-8, Ex 1.  Moreover, it is not clear what type

of image advertising is required.  Defendants argue that advertising merely showing the product is

clearly insufficient; instead the advertising must feature in some way the trade dress itself.  However,

trade dress can be recognizable without advertising specifically telling a consumer to look for it.  For

example, the Coca-Cola Company does not say in its advertising to "look for the hourglass-shaped

bottle," and yet it is one of the most recognizable trade dresses in the world.  *E.g., Rock & Roll Hall of*

---

[6] adidas submitted most of this evidence under seal.  In order to avoid the necessity of sealing this Findings and
Recommendation, this court will not reference specific dollar figures when referencing sales or advertising costs.

*Fame & Museum, Inc. v. Gentile Prods.*, 134 F3d 749, 757 (6th Cir 1998) (Marin, C.J. dissenting: "Doubtless no symbol in the world is so readily recognized").

adidas also has submitted numerous unsolicited media references evidencing the "cult" and "hip" status of the market of the Original Superstar and a sampling of press reports referencing the Three Strip Mark and the Original Superstar Trade Dress, including the shell toe feature. Amended Jorgenson Dec, ¶¶ 8, 29, 34, 41. Those sample references, at a minimum, give rise to a factual inference that the Original Superstar Trade Dress has acquired distinctiveness. Defendants argue that the media references, which nearly uniformly use the term "adidas" as an adjective to describe the particular feature (*i.e.* "adidas three stripes," "adidas shell toes," "adidas Superstars") show that the Original Superstar Trade Dress is not distinctive because, if it were, there would be no need to add the term "adidas" in front of those terms. However, this these references simply recognize adidas' ownership and do not diminish the evidentiary value of these and similar references to the relevant trade dress, or elements thereof. "Evidence of extensive unsolicited media coverage supports a finding of secondary meaning." *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F Supp 980, 992 (D Az 1992), citing *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F2d 946, 950 (2nd Cir 1981).

///

Finally, the Ninth Circuit has noted: "Proof of exact copying, without any opposing proof, can be sufficient to establish secondary meaning [since] '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *Id* at 1016, quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F2d 551, 557-58 (9th Cir 1960). Defendants insist that this dicta cannot be squared with *Wal-Mart* at least insofar as a product design trade dress

24 - FINDINGS AND RECOMMENDATION

case is concerned.  However, since *Wal-Mart*, the Ninth Circuit has cited its prior statements to that effect with approval without drawing any distinction between types of trade dress claims.  *Clicks Billiards*, 252 F3d at 1264 (citing *Transgo*, *Fuddruckers*, *Lisa Frank*, and *Vision Sports* with approval).  Moreover, as discussed above, the Original Superstar Trade Dress is being treated as product design trade dress only because it does not fit squarely into either the product design or product packaging categories.  To the degree that the ambiguous Original Superstar Trade Dress more closely resembles product packaging rather than product design, evidence of exact or intentional copying is relevant to the secondary or acquired meaning category, as these Ninth Circuit cases recognize.

As discussed in more detail below, defendants insist that the trade dress of their shoes is not an exact copy of the Original Superstar Trade Dress.  This court need not resolve the parties' debate over whether defendants' shoes are sufficiently "exact" copies to be termed "knock offs."  Suffice it to say that even a cursory look at the shoes indicates that the trade dress of defendants' shoes incorporates significantly more similarities to, than differences from, the Original Superstar Trade Dress.  Thus, this factor weighs in favor of an inference of intentional copying, which in turn weighs in favor of a finding of secondary or acquired meaning.

Defendants submitted supplemental briefing notifying the court that adidas unsuccessfully sought to register a shell toe design with the United States Patent and Trademark Office and that a third party has also unsuccessfully attempted to register a shell toe design.  According to defendants, the objections by other manufacturers to adidas' request to register the shell toe design show that adidas' use of the shell toe design is not exclusive and undercuts adidas' arguments that its shell toe design is

distinctive or has acquired secondary meaning, or that defendants' trade dress causes a likelihood of confusion.  However, even assuming that the evidence submitted by defendants could withstand adidas' evidentiary objections, it does not assist defendants in defeating adidas' trade dress claims.  As discussed previously, protectable trade dress may be found in any combination of discrete elements and the visual impact of those elements must be considered as a whole.  Thus, this court rejects defendants' suggestion that previous attempts to register a shell toe design necessarily defeats adidas' bid for trade dress protection.

### 3.  Likelihood of Confusion

#### a.  Legal Standard

Defendants also assert that, as a matter of law, there is no likelihood of confusion between their shoes and adidas' shoes.

Liklihood of confusion is a mixed question of law and fact which is "predominantly factual in nature."  *Levi Strauss & Co.*, 778 F2d at 1355.  Likelihood of confusion is considered by examining the "total effect of the defendant's product and package on the eye and mind of an ordinary purchaser."  *First Brands Corp. v. Fred Meyer, Inc.*, 809 F2d 1378, 1383-84 (9th Cir 1987).  As the Ninth Circuit has observed:

> "It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

*Drop Dead Co. v. S. C. Johnson & Son, Inc.*, 326 F2d 87, 96 (9th Cir 1963), *cert denied*, 377 US

907 (1964), quoting *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F 73, 75 (2nd Cir 1910).

      In the Ninth Circuit, neither an intent to confuse nor actual confusion are required elements of a

trademark infringement claim. *See Coca-Cola Co. v. Overland, Inc.*, 692 F2d 1250, 1256 n16 (9th

Cir 1982) (intent to confuse); *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174

F3d 1036, 1050 (9th Cir 1999) (actual confusion). Instead, "[l]ikelihood of confusion will be found

whenever consumers are likely to assume that a mark is associated with another source or sponsor

because of similarities between the two marks." *Academy of Motion Picture Arts & Scis. v.

Creative House Promotions, Inc.*, 944 F2d 1446, 1456 (9th Cir 1991), citing *Shakey's, Inc. v.

Covalt*, 704 F2d 426, 431 (9th Cir 1983).

      The Ninth Circuit has "developed eight factors . . . to guide the determination of a likelihood of

confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F3d 1199, 1205 (9th Cir 2000), citing *AMF,

Inc. v. Sleekcraft Boats* ("*Sleekcraft*"), 599 F2d 341, 348 (9th Cir 1979). Those factors are:

(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual

confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised

by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the

product lines. *Id*. The Sixth Circuit, which employs the same multifactor test used by the Ninth Circuit

in assessing the likelihood of confusion, has pointed out that "[i]n some cases it may be  unnecessary to

undertake an extended analysis to infer confusion, *e.g.*, where there is no difference between the marks

of directly competitive goods/services." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*,

931 F2d 1100, 1107 n4 (6th Cir 1991), citing *Sleekcraft*, 599 F2d at 348.

b.  **Analysis**

1.  **Three Stripe Mark**

Defendants do not dispute that adidas has an incontestable registration concerning the Three Stripe Mark.  Instead, defendants seek summary judgment based on no likelihood of confusion between the Three Stripe Mark and the four stripe mark used on defendants' Jonah and Mikal shoes.

From the mathematical premise that three does not equal four, defendants argue that, as a matter of law, the use of a four stripe design on the side of a casual shoe cannot be confusingly similar to adidas' Three Stripe Mark.  Defendants posit that to find otherwise would grant adidas a monopoly over the use of stripes as decorations on the sides of all sports shoes.

This argument is not well taken.  Although three stripes obviously do not equal four stripes, the issue is not simply the number of stripes.  Instead, the issue is whether the total effect of the allegedly infringing design is likely to cause confusion in the minds of an ordinary purchaser.  While there can be no debate that defendants' four stripe mark has one stripe more than adidas' Three Stripe Mark, so too there can be no debate that many of the other features of the stripes displayed on defendants' Jonah and Mikal models are strikingly similar — if not identical — to the features of the Three Stripe Mark displayed on the Superstar IIK and Campus II models (Jorgenson Dec, Exs 2-3).  The stripes are equal in size, are placed equidistant at a similar or identical angle, are in substantially the same location between the sole and the reinforced area which supports the shoelace holes (with the necessary adjustment to accommodate four rather than three stripes), are displayed in colors which contrast with the background color of the shoes, and have serrated edges.  Thus, this court cannot simply count the

28 - FINDINGS AND RECOMMENDATION

number of stripes and determine as a matter of law that four stripes are not confusingly similar to three stripes.

Second, defendants argue that there can be no confusing similarity between the three and four stripes because adidas' shoes display a number of other adidas trademarks, while defendants' shoes bear B.U.M. registered trademarks.  They also point out that the B.U.M. shoes are sold at Target, at retail prices considerably below the price of the adidas shoes, which will not confuse purchasers.  However, the mere fact that the B.U.M. shoes display the B.U.M. registered trademark does not automatically insulate defendants from liability.  "A copier must not only attempt to avoid likelihood of confusion; it must succeed in doing so.  Thus when there is  a source-indicating label, the label must be effective to make consumer confusion unlikely, in light of all the circumstances."  *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F2d 1117, 1133 (Fed Cir), *cert denied*, 510 US 908 (1993).

Even if some purchasers know they are buying B.U.M. shoes with four stripes, rather than adidias shoes with three stripes, adidas may nevertheless establish the existence of initial interest confusion.  The Ninth Circuit has explicitly recognized that the use of another's trademark in a manner calculated "to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion,[7] may still be an infringement."  *Dr. Seuss Enters. LP v. Penguin Books USA, Inc.*, 109 F3d 1394, 1405 (9th Cir 1997), *petition for cert dismissed*, 521 US 1146 (1997) (citation omitted); *see also Brookfield Communications, Inc.*, 174 F3d at 1062-63 (finding initial interest confusion by using "moviebuff.com" or "MovieBuff" to divert people looking for "MovieBuff" to

---

        [7] The Ninth Circuit analysis, which requires no purchase, raises vexing damages issues which need not and will not be addressed in this Findings and Recommendation.

defendant's web site).  Initial interest confusion allows the infringer to improperly benefit from the goodwill that has developed in a mark.  *Dr. Seuss Enters. LP*, 109 F3d at 1405.

In the same way, a consumer encountering defendants' shoes at Target may be initially drawn to them because they appear to be adidas shoes from a distance.  The shoes sit side-by-side in open boxes that are angled so that the customer primarily sees only the shoes, not the word "B.U.M." on the tongue or the shoebox.  Kaltman Dec, ¶¶ 2-3, Ex 1.  This method of display may trade on adidas' Three Stripe Mark to capture the initial attention of the consumer, which may constitute trademark infringement.

Defendants' argument also ignores the doctrine of post-sale confusion.  Post-sale confusion occurs "when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product."  *Academy of Motion Picture Arts & Scis.*, 944 F2d at 1455.  "The law in the Ninth Circuit is clear that 'post-purchase confusion,' *i.e.* confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act."  *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F3d 848 (9th Cir 2002) (citations omitted).

As evidence of post-sale confusion of potential purchases of athletic shoes, adidas has submitted a double blind survey.  Ford Dec, ¶ 8.  Respondents not in the control group were shown a photograph of the Jonah shoe and asked questions regarding the source and authorization/approval of the shoes.  *Id,* ¶¶ 3, 12.  To focus on the stripes, the shell toe was digitally removed.  *Id*, ¶ 12, n3.  A preliminary review of the responses evidences that approximately 30% of the respondents expressed the belief that defendants' shoes are either made or put out by adidas.  *Id*, ¶ 4.  An additional 3%

expressed the belief that defendants' shoes are being put out with the authorization and approval of

adidas.  *Id*.  This supports a finding of likelihood of post-sale confusion.  *Id*, ¶¶ 5, 17.  Defendants

challenge adidas' survey evidence on the grounds that it does not address children's model shoes,

which are the only models that carry the B.U.M. name.  However, they have submitted no evidence

from which the court may conclude that adult shoes differ so significantly from children's shoes that the

survey must be disregarded.

      Finally, this court cannot ignore other factors, some of which favor a finding of likelihood of

confusion.  One factor is the strength of the mark.  An incontestable registration alone does not

establish a strong mark.  *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F2d 1445, 1449

(9th  Cir 1988).  Instead, strength of the mark in the marketplace must be considered.  In this regard,

adidas has submitted evidence which demonstrates the considerable success it has enjoyed in selling

shoes bearing the Three Stripe Mark.  Amended Jorgenson Dec, ¶¶ 7-9, 31, 35-38.

      Another factor is the proximity of the goods.  "[L]ess similarity between the marks will suffice

when the goods are complementary, the products are sold to the same class of purchasers, or the

goods are similar in use and function."  *Sleekcraft*, 599 F2d at 350; *see also* MCCARTHY, § 24:22

("Where the goods or services are directly competitive, the degree of similarity of marks needed to

cause likely confuison is less than in the case of dissimilar goods or services.").  This factor favors

adidas since defendants are using a four stripe design on a nearly identical product of athletic shoes.

      The other likelihood of confusion factors – evidence of actual confusion, marketing channels

used, the degree of care likely to be exercised by the purchaser, defendants' intent in selecting the

31 - FINDINGS AND RECOMMENDATION

mark, and likelihood of expansion of the product lines – lack any evidence and therefore do not bear on the analysis in light of the factors discussed above.

For these reasons, defendants' motion for summary judgment should be denied to the extent it is premised on a lack of evidence concerning a likelihood of confusion between the four stripe mark on defendants' shoes and adidas' Three Stripe Mark.

### 2. The Original Superstar Trade Dress

Defendants also argue that even if a four stripe mark might theoretically be confusingly similar to the Three Stripe Mark, in this case, the trade dress displayed on their shoes is not in fact confusingly similar to the Original Superstar Trade Dress. This argument also should be rejected.    Here, defendants point out that, unlike the Original Superstar Trade Dress, their shoes: (1) have no perforations between any of the stripes; (2) have no stitching design on the rear side quarter of the shoe; (3) pass the laces through silver eyelets; (4) have a different molded toe construction; and (5) have a different shaped colored moustache.  However, defendants improperly ignore initial interest and post-sale confusion, focusing instead solely on point-of-sale confusion, asserting that these minor differences, as well as the B.U.M. price tags and labels, avoids any confusion.  As discussed above, these minor differences and the source-indicating label may not avoid initial interest confusion.  In addition, "post-sale confusion is equally relevant to a claim of trade dress infringement as it is to trademark infringement." *Payless ShoeSource, Inc. v. Reebok Int'l Ltd.*, 998 F2d 985, 989-90 (Fed Cir 1993).

This case is factually similar to *Payless Shoesource, Inc.*, in which the district court recognized that defendant's private-label inexpensive shoes were "similar in appearance," but held that there would

be no likelihood of confusion because the shoes were sold in different stores to different customers at different prices.  The Federal Circuit vacated the decision, holding that "by exclusively focusing on confusion at the point of sale, the district court effectively disregarded Reebok's argument relating to 'post-sale confusion.'"  *Id* at 989.  In the post-sale context, the similarity of the products themselves is the most important factor tending to prove confusion.  *Id* at 889-90.  "[P]ost-sale observers may be unaware that Payless and Reebok shoes are sold in different stores or at different prices, yet their confusion may be detrimental to Reebok."  *Id* at 990.  Consumers will "attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image."  *Id*.

adidas has submitted some evidence that the materials used in the construction of the Jonah shoes are inferior to the materials used in constructing the Original Superstar shoes.  Zerr Dec, ¶¶ 3-8.  Here the striking similarity of the shoes and the evidence concerning the inferior quality of the B.U.M. shoes presents a triable issue of fact.

///

## IV.    Dilution and Injury to Business Reputation Claims
## (Fourth, Fifth, Sixth, and Seventh Claims for Relief)

### A.  Legal Standard

"Dilution is a cause of action invented and reserved for a select class of marks — those marks with such powerful consumer associations that even non-competing uses can impinge on their value."  *Avery Dennison Corp. v. Sumpton*, 189 F3d 868, 875 (9th Cir 1999) (citation omitted).  The Federal Trademark Dilution Act ("FTDA") defines "[d]ilution" as "the lessening of the capacity of a famous

33 - FINDINGS AND RECOMMENDATION

mark to identify and distinguish goods or services, regardless of the presence or absence of (1)

competition between the owner of the famous mark and other parties, or (2) likelihood of confusion,

mistake or deception."  15 USC § 1127.

Under the FTDA, the owner of a "famous" mark is entitled to an injunction "against another

person's commercial use in commerce of a mark or trade name, if such use begins after the mark has

become famous and causes dilution of the distinctive quality of the mark."  15 USC § 1125(c)(1).

Similarly, Oregon law provides that:

> Likelihood of injury to business reputation or of dilution of the
> distinctive quality of a mark registered under ORS 647.015, or a mark
> valid at common law, or a trade name valid at common law, shall be a
> ground for injunctive relief notwithstanding the absence of competition
> between the parties or the absence of confusion as to the source of
> goods or services.

ORS 647.107.[8]

"[T]he [FTDA] . . . appl[ies] 'only to those marks which are both truly distinctive *and* famous,

and therefore most likely to be adversely affected by dilution.'"  *Avery*, 189 F3d at 876 (citation

omitted, emphasis in original).  Thus, in order to succeed on a dilution claim, a plaintiff must show: "(1)

its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the

defendant's use began after the plaintiff's mark became famous; and (4) the defendant's mark presents

a likelihood of dilution of the distinctive value of the mark."  *Id* at 874, citing *Panavision Int'l, L.P. v.*

*Toeppen*, 141 F3d 1316, 1324 (9th Cir 1998).

---

[8] For purposes of the present motion, the parties and this court assume that there are no fundamental differences
between the state laws with respect to adidas' state law claims.  Hearing Transcript, pp. 42-43.

B. **Defendants' Challenges**

Defendants argue that they are entitled to summary judgment against adidas' Fourth and Fifth

Claims for Relief because the Three Stripe Mark and the Original Superstar Trade Dress are not

sufficiently distinctive or famous to merit protection under the anti-dilution provisions of the FTDA.  A

recent article discussing this issue notes a split between the Circuits over whether a dilution claim may

be premised upon a showing that a mark is distinctive because it has acquired distinctiveness through

secondary meaning:

> McCarthy argues that a "trademark cannot be famous unless it is
> distinctive."  However, the Lanham Act allows two forms of
> distinctiveness:  inherent and acquired.  The circuits disagree whether
> the FTDA requires inherent distinctiveness or merely distinctiveness
> acquired through secondary meaning.  The First and Third Circuits read
> only a general requirement of distinctiveness, whether achieved
> inherently or through secondary meaning.  In contrast, the Second
> Circuit essentially reads the FTDA as requiring a showing of inherent
> distinctiveness.  The difference is critical, given the potential number of
> marks that acquire distinctiveness through secondary meaning.

Mangis, Daniel E., *When Almost Famous Just Isn't Famous Enough: Understanding Fame in the

Federal Trademark Dilution Act as a Term of Art Requiring Minimal Distinctiveness*, 21 REV

LITIG 455, 468 (Spring 2002), quoting MCCARTHY, § 24:91.1 (footnotes and citations omitted).

This article goes on to note that the Ninth Circuit will allow a dilution claim premised upon a

showing of secondary meaning, but does not identify what minimal level of distinctiveness will suffice:

> [I]n *Avery Dennison Corp. v. Sumpton*, the Ninth Circuit explicitly
> rejected the argument of the appellant that "the distinctiveness required
> for famousness under the [FTDA] is inherent, not merely acquired
> distinctiveness."  In doing so, the Ninth Circuit found that the minimal
> distinctiveness required for dilution protection is more than a mere
> showing of acquired distinctiveness through secondary meaning.  But

> the court offers little in the way of determining what minimal level of
> distinctiveness is appropriate.

*Id* at 472-73 (citations and footnotes omitted).

Citing *Felix the Cat Prods., Inc. v. New Line Cinema Corp.*, 54 USPQ2d 1856, 1859 (DC

Cal 2000), defendants argue that adidas must show that the Three Stripe Mark and the Original

Superstar Trade Dress have elevated levels of distinctiveness to be protected under the dilution

statutes.  However, *Felix the Cat* merely states that "a mark must be more than 'distinctive' to qualify

for protection under the dilution statutes."  *Id* (citations omitted).  That conclusion flows naturally from

the FTDA, which identifies a non-exclusive list of eight factors a court may consider in deciding whether

a mark is sufficiently famous to merit protection:

> In determining whether a mark is distinctive and famous, a court  may
> consider factors such as, but not limited to —
> (A) the degree of inherent or acquired distinctiveness of the mark; (B)
> the duration and extent of use of the mark in connection with the goods
> or services with which the mark is used;
> (C) the duration and extent of advertising and publicity of the mark;
> (D) the geographical extent of the trading area in which the mark is
> used;
> (E) the channels of trade for the goods or services with which the mark
> is used;
> (F) the degree of recognition of the mark in the trading areas and
> channels of trade used by the marks' owner and the person against
> whom the injunction is sought;
> (G) the nature and extent of use of the same or similar marks by third
> parties; and
> (H) whether the mark was registered under the Act of March 3, 1881,
> or the Act of February 20, 1905, or on the principal register.

15 USC § 1125(c)(1)(A)-(H).

Although the statute states that these factors are used to determine whether a mark is "*distinctive and* famous" to merit protection, which could lead to the conclusion that some heightened degree of *distinctiveness* is required, McCarthy concludes that this language "was mere hyperbole to off-set the fact that federal registration was not required for federal dilution protection; as a result, the drafting committee included the 'redundant' language to emphasize that famous marks should be distinctive enough to qualify for federal registration." 21 REV LITIG at 472.  In seeming recognition of this, the Ninth Circuit refers to the factors identified in 15 USC § 1125(c)(1) as the "*famousness factors*" and states that the FTDA "*requres a showing greater than distinctiveness to meet the threshold element of fame.*"  *Avery*, 189 F3d at 876-77 (emphasis added).  In other words, the Ninth Circuit explicitly rejects the notion that marks which have acquired distinctiveness through secondary meaning cannot qualify for protection under the dilution statutes and views the degree of distinctiveness simply as one factor to consider when determining whether the mark is sufficiently famous.

In order to meet the threshold requirement of famousness, the Ninth Circuit requires the mark to be "truly prominent and renowned."  *Id* at 875 (citations omitted).  Although the Ninth Circuit has shied away from deciding "the exact degree of strength a protectable mark must reach," it has stated that the mark "must at least be mature and well-known."  *Fruit of the Loom, Inc. v. Girouard*, 994 F2d 1359, 1363 (9th Cir 1993).

### 1. The Three Stripe Mark

Defendants do not dispute that adidas owns the Three Stripe Mark which has become incontestable due to longstanding registration.  In addition, adidas has submitted evidence that it has

made extensive use of the Three Stripe Mark in connection with its athletic footwear since 1952 and has spent huge sums advertising, promoting and developing its brand identity, including that of the Three Stripe Mark both domestically and internationally. Amended Jorgenson Dec, ¶¶ 13, 19-21. It has also submitted evidence which leads to the reasonable inference that the Three Stripe Mark is widely recognized in the athletic apparel industry. In contrast, defendants have submitted no evidence of any other manufacturer of athletic apparel using three stripes to identify its products.

In short, viewing the evidence in the light most favorable to adidas, there is sufficient evidence in the record regarding the fame of the Three Stripe Mark for adidas to withstand summary judgment against the Fourth Claim for Relief.

### 2. <u>The Original Superstar Trade Dress</u>

Defendants initially question whether trade dress can be protected under the dilution statutes at all, and whether such protection might raise constitutional concerns. However, they devote only two lines of their briefing to that issue and suggest that this court need not reach that issue to rule on this motion. Thus, this court addresses only the issue of whether adidas has submitted sufficient evidence of the fame of the Original Superstar Trade Dress to survive summary judgment and expresses no opinion as to the viability of these other issues mentioned in passing by defendants.

In arguing for summary judgment against the dilution claim related to the Original Superstar Trade Dress, defendants initially take the position that the trade dress does not in fact exist. As discussed earlier, this argument was premised upon some initial confusion by defendants as to the existence of a "Superstar" line of shoes. *See* footnote 2, *supra*.

38 - FINDINGS AND RECOMMENDATION

Defendants also argue that adidas' failure to seek registration of the Original Superstar Trade Dress and unsuccessful efforts to register a shell toe design show that the Original Superstar Trade Dress is not famous.  Once again, this court is not persuaded that previous attempts to register a shell toe design necessarily defeats adidas' bid for protection of the Original Superstar Trade Dress. Moreover, registration (or lack thereof) is only one factor considered when making a famousness determination and adidas has submitted evidence in its favor on a number of the other factors enumerated in 15 USC § 1125(c)(1)(A)-(H).

adidas has submitted evidence that shoes bearing the Original Superstar Trade Dress have been manufactured and sold by adidas since the late 1960s and that it achieved sufficient fame in the 1970s that they were worn by a number of famous NBA players.  Amended Jorgenson Dec, ¶ 31.  In addition, adidas has sold substantial numbers of shoes bearing the Original Superstar Trade Dress, which sales have increased dramatically over the past five years.  *Id*, ¶ 42.  adidas has spent substantial sums to promote the Original Superstar Trade Dress both through brand-specific advertising and through active product placement.  *Id*, ¶¶ 36-37.  The record does not reveal the geographical extent of the trading area in which adidas promotes the Original Superstar Trade Dress, nor has adidas broken down the sales figures for shoes bearing the Original Superstar Trade Dress into geographical sales.  However, the number of shoes sold supports the inference that shoes bearing the Original Superstar Trade Dress have been marketed and sold over a wide geographical area.  There is some evidence in the record that other manufacturers incorporate design elements (*i.e.* stripes, heel patches) in their shoes which are similar to some of the individual elements of the Original Superstar Trade Dress.  However, excluding the allegedly infringing designs at issue in this case, the record is devoid of

39 - FINDINGS AND RECOMMENDATION

evidence that third parties have used designs incorporating all four of those elements of the Original Superstar Trade Dress.

Based on this evidence, this court concludes that adidas has submitted sufficient evidence of the fame of the Original Superstar Trade Dress to withstand defendants' motion. Thus, to the extent defendants seek summary judgment that the Original Superstar Trade Dress is not sufficiently famous to merit protection under the dilution statutes, the motion should be denied.

**V.  Unfair and Deceptive Trade Practices (Ninth Claim)**

The remaining Ninth Claim alleges unfair and deceptive trade practices in violation of ORS 646.605-.656 and similar statutes of other states as to the Three Stripe Mark.  Under Oregon law, a person engages in an unlawful practice by "caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services [or] [c]aus[ing] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another."  ORS 646.608(1)(a) and (b).

No party specifically addressed this claim.  However, as discussed above, this court finds that defendants are not entitled to summary judgment against adidas' federal claims.  Because defendants' arguments concerning the state law claims hinge upon their assertion that they were entitled to summary judgment against the federal claims, summary judgment should be denied with respect to the Ninth Claim under state law.

## RECOMMENDATION

40 - FINDINGS AND RECOMMENDATION

For the reasons stated above, defendants' B.U.M. International Incorporated's and Target Corporation's Motion to Dismiss (docket #22), which has been converted into a motion for summary judgment, should be DENIED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **August 19, 2002.**  If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, the response is due no later than **September 6, 2002.**  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 31st day of July, 2002.

___/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge
