**Stephen M. Feldman**, OSB No. 93267; sfeldman@perkinscoie.com
**Thomas R. Johnson**, OSB No. 01064; trjohnson@perkinscoie.com
PERKINS COIE LLP
PacWest Center, Suite 1500
1211 S.W. Fifth Avenue
Portland, OR 97204-3715
Telephone: (503) 727-2000
Facsimile: (503) 727-2222

      Attorneys for Plaintiffs

**Jerre B. Swann**; jswann@kilpatrickstockton.com
**William H. Brewster**; bbrewster@kilpatrickstockton.com
**R. Charles Henn Jr.**; chenn@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

      Of Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **ADIDAS AMERICA, INC.** and **ADIDAS-SALOMON AG**, <br><br>      Plaintiffs, <br><br>    v. <br><br> **TARGET CORP., E. S. ORIGINALS, INC.** and **B.U.M. INTERNATIONAL, INC.**, <br><br>      Defendants. | NO. CV01-1582 RE <br><br><br> **REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.** |

i-    REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S.
ORIGINALS, INC.
[21184-0009/PA030090.128]

*PERKINS COIE LLP*
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

# CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     ARGUMENT ......................................................................................................2

        A.      The ESO Shoes and the adidas Superstar are Strikingly Similar........................4

                1.      "3 ≠ 4" Is Right in Mathematics, But Wrong in Trademark Law.................4

                2.      The Lack of Logos on the ESO Shoes *Increases* Confusion........................6

                3.      *De Minimis* Third-Party Use of Stripes Does Not Affect adidas's Claim .....8

        B.      The Ford Survey Proves That Initial-Interest and Post-Sale Confusion is
                Likely ...........................................................................................10

        C.      Marketing Channels Are Irrelevant in a Post-Sale Confusion Case ..................16

        D.      ESO Acted in Bad Faith...............................................................17

III.    CONCLUSION ..................................................................................20

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S.
ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

# TABLE OF AUTHORITIES

## Cases

*Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446 (9th Cir. 1991) ..................................................................3, 7

*AMP, Inc. v. Foy*, 540 F.2d 1181 (4th Cir. 1976) ....................................................17

*Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419 (D. Minn. 1989) ...................17

*Baker v. Master Printers Union*, 34 F. Supp. 808 (D.N.J. 1940) ..............................5

*Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920 (10th Cir. 1986) ...........17

*Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir. 1930)................19

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999)................................................................................................2, 10

*C.A.E., Inc. v. Clean Air Eng'g, Inc.*, No. 97 C 3264, 2000 WL 28274 (N.D. Ill. Jan. 10, 2000).................................................................................................11

*Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988)..............17

*Charrette Corp. v. Bowater Communication Papers, Inc.*, 13 U.S.P.Q.2d 2040 (T.T.A.B. 1989) ...............................................................................................10

*Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695 (5th Cir. 1981) .................................................................................................18, 19

*Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250 (9th Cir. 1982) ...........................6

*Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler*, 305 F. Supp. 1210 ( N.D. Cal. 1969).......................................................................................................11

*Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) ........8

*Copy Cop v. Task Printing*, 908 F. Supp. 37 (D. Mass. 1995) ...............................16

*Cyclonaire Corp. v. United States Sys., Inc.*, 209 U.S.P.Q. 310 (D. Kan. 1980)....19

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992) .............10

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571 (D.N.J. 1985) ........12

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

*Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114 (9th Cir.1990).................................10

*Fleishmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963) .................4

*G. Heileman Brewing Co. v. Indep. Brewing Co.*, 191 F. 489 (9th Cir. 1911).........................4

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000)........................................5

*JouJou Designs, Inc. v. JoJo Ligne Internationale, Inc.*, 821 F. Supp. 1347 (N.D. Cal. 1992)..................................................................................................................................11

*Kimberly Knitwear Inc. v. Kimberly Stores Inc.*, 331 F. Supp. 1339 (D. Mich. 1971) ......................................................................................................................................19

*Kroger Co. v. Johnson & Johnson*, 570 F. Supp. 1055 (S.D. Ohio 1983)..............................18

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117 (Fed. Cir. 1993)...........................17

*Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir. 1980)................................3, 4, 7

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir. 1999) .....................................................................................................................................9

*M'Otto Enters., Inc. v. Redsand, Inc.*, 831 F. Supp. 1491 (W.D. Wash. 1993) .......................5

*Nabisco, Inc. v. PF Brands, Inc.*, 50 F.Supp.2d 188 (S.D.N.Y. 1999) ...................................9

*National Football League v. Jasper Alliance Corp.*, 16 U.S.P.Q.2d 1212 (T.T.A.B. 1990) ....................................................................................................................10

*National Lead Co. v. Wolfe*, 223 F.2d 195 (9th Cir. 1955)......................................................9

*National Steel Products Co. v. Quonset Hut, Inc.*, 211 U.S.P.Q. 820 (T.T.A.B. 1981) ......................................................................................................................................10

*Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166 (5th Cir. 1986) ................................11

*OSEM Food Indus. v. Sherwood Foods, Inc.*, 917 F.2d 161 (4th Cir. 1990)..........................19

*Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F.Supp.2d 335 (D. N.J. 2002)................14

*Plough, Inc. v. Kreis Labs.*, 314 F.2d 635 (9th Cir. 1963)......................................................11

*Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F. Supp. 232 (S.D.N.Y. 1994)...................14

*Streetwise Maps, Inc., v. Vandam, Inc.*, 159 F.3d 739 (2d Cir. 1998) ....................................11

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

*SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 890 F. Supp. 1559 (N.D. Ga. 1994) ................................................................................................16

*Teaching Co. L.P. v. Unapix Entertainment, Inc.*, 87 F. Supp.2d 567 (E.D. Va. 2000) ................................................................................................16

*Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir. 1985) ...................9

*Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir. 1988) ...........................................6

**Statutes**

15 U.S.C. § 43(a) .........................................................................................14

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* (4th ed. 2002) .......................................................................................... passim

Restatement of the Law (Third) of Unfair Competition (995).................................5

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE** LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

Plaintiffs adidas-Salomon AG and adidas America, Inc. (collectively, "adidas") respectfully submit this reply memorandum in support of their motion for partial summary judgment against defendant E.S. Originals, Inc. ("ESO").[1]

## I.    INTRODUCTION

With full knowledge of the famous adidas Superstar shoe, ESO set out to design, import, and sell a four-stripe "version" of the Superstar.[2]  According to this Court, witnesses, and even ESO's co-defendants, ESO succeeded in creating a shoe that is "strikingly similar" to the Superstar.[3]  "Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports.  Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement."  3 J. Thomas McCarthy,

---

[1] Together with this reply brief, adidas is submitting the following declarations: (1) Rebuttal Declaration of Dr. Gerald L. Ford ("Ford Rebuttal"); (2) Rebuttal Declaration of Marian Friestad ("Friestad Rebuttal"); (3) Rebuttal Declaration of Scott Galloway ("Galloway Rebuttal").  Each of these experts previously filed a declaration or report in this case and, thus, any citation herein to any declaration or report of these experts that does not contain the word "Rebuttal" is referring to the expert's initial submission.  adidas is also submitting concurrently herewith the Declaration of Michael K. Heilbronner ("Heilbronner Decl.") and the Declaration of Stephen M. Feldman ("Feldman Declaration"), which is being filed under seal.  All other citations to declarations are referring to declarations previously filed in this case.

[2] Deposition of Dennis Dolinsky ("Dolinsky Dep.") at 13; Deposition of Alan Esses ("Esses Dep.") at 20-21.  The transcripts of the depositions of Alan Esses and Dennis Dolinsky are attached as Exhibits 1 and 2, respectively, to the Declaration of Thomas R. Johnson, which was filed on July 2, 2002, and which subsequently has been placed under seal.  The relevant portions of the transcripts of all other depositions cited in this memorandum are attached as exhibits to the accompanying Feldman Declaration.

[3] Magistrate Judge Stewart and this Court both recognized that the BUM shoe (which is identical to the ESO shoe except that the ESO shoe does not have the B.U.M. word mark on the tongue) is "strikingly similar" to the Superstar.  (F&R at 28; Opinion & Order at 8).  Professor Friestad, in her detailed analysis of the shoes from the perspective of a consumer psychologist, noted the overwhelming similarities between the ESO shoe and the Superstar.  (Friestad Decl. § 8).  Moreover, Anthony Miller, a BUM employee who holds a design degree, repeatedly admitted that the BUM shoes are "strikingly similar" to the adidas Superstar.  (Miller Dep. at 87, 98).  ACI, the footwear company that designed the BUM shoe, admitted that it was intended to be a copy of the ESO shoe.  (Hardy Dep. at 40-46, 60-61).  Target also admitted that the ESO shoes "incorporated" the adidas Shell Toe feature.  (Koller Dep. 54-55).

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

*McCarthy on Trademarks & Unfair Competition* (hereinafter, "McCarthy") § 23.20 at 23-70 (4th ed. 2002). Given the striking similarity of the shoes at issue, basic trademark law, consumer psychology, and common sense all lead to the inescapable conclusion that the ESO version of the Superstar infringes adidas's trademark rights.

ESO's response fundamentally fails to address the two key issues in the case, initial-interest and post-sale confusion, focusing almost exclusively on point-of-sale confusion. As such, ESO fails to raise any material issues of fact that preclude summary judgment in adidas's favor as to the issue of ESO's liability for trademark infringement and unfair competition. Indeed, ESO's opposition brief is little more than a recitation of its companion Declaration of Robert L. Klein, which itself is unsupported and based on unsound reasoning. Mr. Klein has virtually **no** experience, education, or expertise in the areas he opines about -- conducting likelihood of confusion surveys, brand strategy, and consumer psychology. His criticisms are based on no data, and during his deposition, he could cite no legal or scientific authority for his criticisms of the Ford survey. In fact, Klein admitted that based on his own "meticulous" and "rigorous" review of the survey results, and even deducting all the responses he personally deemed inappropriate, the Ford survey still shows that **more than 25% of potential consumers are confused** by the ESO shoes -- a level far above that required by courts to find likely confusion as a matter of law.

## II.    ARGUMENT

Trademark law recognizes that consumers can be confused at three separate and distinct times, and that confusion at any one of these times gives rise to a claim for infringement and unfair competition. The first of these is "initial-interest" confusion, which is when a consumer sees a product either in an advertisement or on display and immediately (but mistakenly) believes that that product emanates from another source. *See Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1063 (9th Cir. 1999) ("initial interest confusion is actionable under the Lanham Act"); McCarthy, *supra*, § 23.01[4][b] at 23-14 ("[C]onfusion that creates

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

initial customer interest, even though no actual sale is finally completed as a result of the confusion" is actionable.").  The second type of confusion is known as "point-of-sale" confusion because it occurs when a consumer actually purchases the defendant's product at a store believing it to be either put out by or licensed by the plaintiff.  The final type, "post-sale" confusion, occurs when a potential consumer sees the defendant's product being actually worn by another person (apart from any of the product's packaging or hang tags), and mistakenly attributes that product to the plaintiff.  *See Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1455 (9th Cir. 1991) ("Post-sale confusion occurs when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product."); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding that the defendant's label would cause a likelihood of confusion among "prospective purchasers . . . who observe [defendant's] projecting label after the point of sale").

In this case, confusion is most likely during the initial-interest stage or in the post-sale environment.  For example, someone leafing through the Sunday newspaper will come across one of Target's flyers advertising "men's athletic shoes" (without any reference to PRO SPIRIT or ESO) and mistakenly believe these are adidas shoes.  (Koller Dep., Ex. 5).[4]  In this example, this person exhibits "initial-interest" confusion even if she ultimately realizes that the shoes are not adidas shoes once she gets to the store and sees the shoebox.  Post-sale confusion occurs after the shoes have been purchased and the purchaser is wearing the ESO shoes while flipping burgers at his backyard cook-out and a neighbor sees the shoes and mistakenly thinks they are adidas shoes. (*See* Dolinsky Dep. at 70, noting that the ESO shoes are "barbeque" shoes).

Like a ship silently passing in the night, ESO's response to adidas's motion for summary judgment fails to address the critical issues in the case -- initial-interest and post-sale confusion. Instead, ESO focuses almost exclusively on distinctions that are relevant *only* to point-of-sale

---

[4] Exhibit 5 to the Koller Deposition is attached to the accompanying Feldman Declaration as Exhibit D.

3-    REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S.
ORIGINALS, INC.
[21184-0009/PA030090.128]

**Perkins Coie llp**
1211 S.W. Fifth Avenue, Suite 1500
Portland, Oregon 97204
(503) 727-2000

confusion.  Because it is black-letter law that initial-interest and post-sale confusion give rise to actionable trademark infringement, and because there are no disputed issues of material fact relating to these types of confusion, adidas's motion should be granted.

## A.    The ESO Shoes and the adidas Superstar are Strikingly Similar

ESO asserts that its shoes are distinguishable from the adidas Superstar for three reasons: (i) the ESO shoes have four stripes instead of three; (ii) the PRO SPIRIT mark appears at Target stores; and (iii) three other footwear companies purportedly market shoes with four stripes.

### 1.    "3 ≠ 4" Is Right in Mathematics, But Wrong in Trademark Law

adidas does not deny that the Superstar shoes bear three stripes and ESO's shoes bear four.  The inquiry in a trademark case, however, does not end after this simple counting exercise. "It is axiomatic in trademark law that 'side-by-side' comparison is not the test."  *Levi Strauss & Co.*, 632 F.2d at 822.  As Professor McCarthy aptly noted, "A court should not indulge in a prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers, for this is not the context in which purchasers are faced with the marks."  McCarthy, *supra* § 23:58, 23-173.

Heeding Professor McCarthy's teachings, the courts recognize that consumers are likely to view the plaintiff's and the defendant's products independently, with only a recollection of what the other looked like.  As one court recently explained:  "[T]he law dictates that a 'side-by-side' comparison is inappropriate, since that is generally not the condition under which the purchaser will encounter them.  The essential issue is whether the purchaser will be able to distinguish the mark before him from another which may be in his memory."[5]  *M'Otto Enters.,*

---

[5] This has been the law in the Ninth Circuit for almost a century.  *See Fleishmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 161 (9th Cir. 1963) ("[T]he members of the purchasing public have only general impressions which must guide them in the selection of products.  We think that the purchaser of [defendant's product] would have no way of pulling from his pocket a precise copy of [plaintiff's] label to compare with the label on [defendant's product].");  *G. Heileman Brewing Co. v. Indep. Brewing Co.*, 191 F. 489, 497 (9th Cir. 1911) ("Now, to one scanning the detailed description of these two Dutch scenes, or laying the pictures

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

*Inc. v. Redsand, Inc.*, 831 F. Supp. 1491, 1501 (W.D. Wash. 1993).  Thus, the test for similarity is more fluid, asking whether a consumer, when presented with ESO's shoe, is likely to believe that it is put out by or with the authorization of adidas.  "The similarity between two designations is judged by the total impression created by the designations and not by a comparison of individual features.  Although individual features may be dissimilar, the total effect of the two designations may be similar."  Restatement of the Law (Third) of Unfair Competition § 21, cmt. c, at 230 (1995).[6]  This is precisely the situation here, in which the "total effect" of the ESO shoe is that it is strikingly similar to the adidas Superstar.

Two judges, Magistrate Stewart and this Court, have deemed the shoes at issue to be "strikingly similar."  (F&R at 28; Opinion & Order at 8.)  The Fed. R. Civ. P. 30(b)(6) witness from defendant BUM, who has a degree in design, has stated that the BUM Jonah shoe, which was copied (at Target's direction)[7] from the ESO shoe, is "strikingly similar" to the adidas Superstar model. (Miller Dep. at 87, 98).  Dr. Friestad, a well-respected expert in the field of consumer psychology, has meticulously examined the shoes at issue and concluded that: (i) they "bear an extremely strong resemblance to each other" – that they "exhibit a strong 'family resemblance'"; (ii) that based on her independent and meticulous examination of the questionnaires from the Ford survey (discussed below), the ESO shoe overwhelmingly triggers the adidas "memory traces"; (iii) that "a reasonable hypothesis would be that consumer confusion would be likely to occur"; and (iv) "consumers' initial interest in the BUM and ESO shoes would

---

side by side, there could be no trouble in distinguishing the one from the other.  But this is not the test.  Will confusion result to the purchasing public by the use of the two not brought into direct or special comparison?").

[6] It is well settled that distinctions considered minor in the consumer's mind are insufficient to avoid liability for infringement.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) ("Quibbles over trivial distinctions between . . . logos are unimpressive."); *see also Baker v. Master Printers Union*, 34 F. Supp. 808, 811 (D.N.J. 1940) ("few would be stupid enough to make exact copies of another's mark or symbol").

[7] Hardy Dep. at 60- 61.

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

be determined by their visual similarity to a shoe made by or 'put out by' adidas." (Friestad Decl. §§ 8, 15).  ESO presents absolutely **no** rebuttal to these facts.[8]

The law follows human logic.  "The closely related nature of the products and the similarity of the marks make it probable that [ultimate consumers] would assume ... some affiliation."  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1189 (6th Cir. 1988) (quoting McCarthy, *supra*, § 23.03[2], at 23-46 (3d ed. 1992)).

### 2.    The Lack of Logos on the ESO Shoes *Increases* Confusion

ESO argues that the PRO SPIRIT mark is used widely in connection with its footwear products inside Target stores.[9]  Even assuming this is true, that has no bearing whatsoever on the issues of initial-interest or post-sale confusion, where the words "PRO SPIRIT" are not used on or in connection with the shoes.  For example, the shoes were advertised in weekly advertising circulars distributed to millions of potential customers without *any* reference to PRO SPIRIT.  (Koller Dep. 117-119, Ex. 5).  Moreover, when the shoe is worn, the words "PRO SPIRIT" that are printed on the insole are invisible.

---

[8] The only testimony ESO presents to rebut Dr. Friestad's analysis is the Declaration of Robert L. Klein.  Mr. Klein admitted, however, that he has had no formal education in consumer psychology (Klein Dep. at 6), was not an expert in consumer psychology (*id.* at 38), and has no basis for rebutting Dr. Friestad's conclusions.  (Klein Dep. at 87).  Mr. Klein further admitted that he did not even attempt to rebut Dr. Friestad's conclusions regarding initial-interest confusion.  (Klein Dep. at 120-21).  Mr. Klein's observations about Dr. Friestad's report are, therefore, neither relevant nor persuasive.  (*See, generally,* Rebuttal Declaration of Marian Friestad).  In fact, Mr. Klein admits that Dr. Friestad's report is based on commonly accepted principles of cognitive psychology.  (*Id.* ¶ 1).

[9] In stark contrast to the voluminous and varied offerings regarding the fame of the Three-Stripe Mark, and relying on the testimony of a **single** Target employee, ESO asserts that "customers are aware of the PRO SPIRIT trademark and many of those customers associate said trademark with merchandise available only at Target."  (ESO's Response Brief at 16).  There is absolutely no documentary evidence, empirical data, or survey evidence to support this claim.  Moreover, it is well established that "employees are not qualified to testify as to what their customers are thinking." *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1255 (9th Cir. 1982). *See also* Plaintiffs' Motion to Strike, filed concurrently herewith.

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

ESO then argues that the Superstar shoe bears the adidas Trefoil logo on the tongue, while the ESO shoes have no visible indicia of source, and therefore consumers seeing the ESO shoes will know they are not adidas shoes. A very similar argument was considered and rejected by the Ninth Circuit in *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir. 1980), a case involving the well-known red tag stitched into the seam of the pocket on Levi's blue jeans. There, Wrangler came out with pants also having a small red tag on the back pocket of their jeans (which Wrangler called a "projecting label"). Wrangler argued that it sold its pants with a label prominently featuring the well-known WRANGLER trademark, and therefore consumers would not be confused. The Ninth Circuit explained the flaw in this argument:

> First, nothing of record indicates that the mere presence of Wrangler's word mark avoids a likelihood of confusion. A latecomer who adopts a mark with intent to capitalize upon a market previously developed by competitors in the field must at least prove that his effort has been futile. Second, Wrangler focuses upon the condition of its pants when sold and limits its argument to "point of sale" circumstances. However, billboards and other point of sale materials are removed by the purchaser and have no confusion-obviating effect when the pants are worn. Wrangler's use of its projecting label is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale.

*Id.* at 822 (internal citations omitted).[10]

Ignoring this precedent, ESO cites *Lindy Pen*[11] and *Reebok*,[12] in support of its arguments. These cases are factually inapposite and, if anything, support adidas's position. The *Lindy* court concluded that the pens were totally visually distinct because each pen bore the trademarks of

---

[10] The Ninth Circuit rejected ESO's argument again in *Academy of Motion Picture Arts and Sciences*, when defendant argued that purchasers would be confronted with its brand name through marketing presentations and literature. The Court noted that this ignored post-sale confusion, concluding that "a large secondary audience . . . would see the award without such clarifying marketing aids. As a result, this secondary audience might conceivably assume the Star Award was somehow associated with the Oscar." 944 F.2d at 1455.

[11] 725 F.2d 1240 (9th Cir. 1984).

[12] 5 U.S.P.Q.2d 1830 (C.D. Cal. 1987).

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

their respective manufacturers (BIC and LINDY).  Similarly, in *Reebok*, the court noted the "overall differences in appearance and the *highly visible* individual names of each of the brands of shoes."  5 U.S.P.Q.2d at 1831 (emphasis added).  In this case, by contrast, the ESO shoe bears no logos or trademarks indicating that the shoes are put out by ESO.  Thus, a consumer confronted with the ESO shoe in the pre-sale or post-sale environment will see no source-identifying indicia other than the Shell Toe and the stripes, and is likely to believe the shoe emanates from adidas.  Moreover, given the obviously poor quality of the ESO shoes, that consumer is likely to think less of the adidas brand.  (Klein Dep., Ex. 4; Koller Dep. at 70, 93-94; Galloway Decl. § 8).[13]

### 3.    *De Minimis* Third-Party Use of Stripes Does Not Affect adidas's Claim

ESO asserts that, of the hundreds of footwear companies, three of them sell footwear that bears stripes on their uppers -- K-Swiss, Skechers, and a Canadian company called Aldo Group.[14] ESO fails to explain the relevance of this argument to the pending motion.  It is black-letter law that "a third party's prior use of a trademark is not a defense in an infringement action." *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996).

Moreover, ESO's implication that adidas has failed to police infringers of the Three-Stripe Mark is patently false.  adidas invests a significant amount of time and resources each year in policing and enforcing its trademark rights.  (Heilbronner Decl. ¶ 3).  Not only does adidas send numerous cease-and-desist letters to infringers, but adidas regularly files suit against significant infringers if initial, informal efforts prove unsuccessful in stopping the infringement.

---

[13] Exhibit 4 to the Klein Deposition is a Vega shoe purchased at a Target store on January 6, 2003.  It is being filed concurrently as Exhibit I to the Feldman Declaration.

[14] It is important to note that ESO concedes that there are **no** third parties that have sold footwear bearing imitations of the Superstar Trade Dress (or the Shell Toe feature), other than those that have been the subject of lawsuits brought by adidas.

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

(*Id*. ¶ 4).[15]  In the last eighteen months alone, adidas has filed at least five separate lawsuits in federal court against companies selling imitations of the Superstar.  (*Id*. ¶ 5).  During that same period, adidas also has filed numerous lawsuits against companies and individuals infringing the Three-Stripe Mark.  (*Id*.)

The law does not require adidas to sue all known infringers at once.  *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1018 (9th Cir. 1985) ("[A]n owner is not required to act immediately against every possible infringing use to avoid a holding of abandonment.  Such a requirement would unnecessarily clutter the courts.").  adidas currently has several cases pending against four-stripe infringers, and intends to pursue others as these cases are resolved.  adidas long ago entered into an agreement with K-Swiss addressing the use of stripes on footwear.  (Heilbronner Decl. ¶ 6).  adidas's lawsuits against infringers of the Three-Stripe Mark and its agreement with K-Swiss evidence the strength of adidas's Three-Stripe Mark. *See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999) ("successful policing of a mark adds to its strength to the extent that it prevents weakening of the mark's distinctiveness in the relevant market").  Thus, despite having notice of this lawsuit for more than a year, the only potentially pertinent third-party uses ESO could find were four-stripe shoes advertised by Skechers and Aldo Group.  To the extent these two companies are cited by ESO in an attempt to question the strength of the Three-Stripe Mark, it falls well short.

Third-party use can affect a mark's strength only when such use is widespread, significant, and unpoliced.  *See National Lead Co. v. Wolfe*, 223 F.2d 195, 204 (9th Cir. 1955) (stating that a showing of third party uses were too "inconsequential to a establish a claim . . . that appellant's mark has become a weak mark"); *Nabisco, Inc. v. PF Brands, Inc.*, 50 F.Supp.2d 188, 203 (S.D.N.Y. 1999) (noting that insignificant third party use did not diminish the strength of plaintiff's trademark).  In this case, there is absolutely **no** evidence of the extent of sales by

---

[15] ESO is no doubt aware of this fact, having reviewed literally thousands of pages of documents from hundreds of enforcement files produced by adidas in this case.

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

these companies, how long such uses have been in existence, where the shoes are marketed or sold, nor any evidence of the public's awareness of the referenced shoes.[16]  As such, this assertion by Mr. Esses cannot possibly raise a genuine issue of material fact with respect to the strength of the Three-Stripe Mark.[17]  It is undisputed that the adidas Three-Stripe Mark and the Superstar Trade Dress are among the strongest footwear brands in the United States.  (Amended Jorgenson Decl. ¶¶ 8, 13-36; Galloway Decl. §§ 5-6; Guyer Decl. ¶¶ 2-4).

## B.    The Ford Survey Proves That Initial-Interest and Post-Sale Confusion is Likely

ESO argues that adidas has presented no evidence of actual confusion, and that this lack of evidence is "probative that there is no likelihood of confusion."  (ESO's Response Brief at 11). It is well settled in the Ninth Circuit, however, that "because the lack of actual confusion can be difficult to obtain, its absence is generally unnoteworthy and is given little probative weight." *See Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1050 (9th Cir. 1999); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) (stating "the absence of [actual] confusion evidence need not create an inference that there is no likelihood of confusion"); *Eclipse Assocs. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1118-19 (9th Cir.1990) (noting that failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove).  In fact, courts in the Ninth Circuit properly have granted motions for summary judgment on claims of trademark

---

[16] adidas is in the process of preparing papers to file suit against Skechers, and had never encountered the Aldo shoe in the marketplace prior to receiving the Esses Declaration less than two weeks ago. (Heilbronner Decl. ¶ 6).

[17] Lists or photographs of third-party marks, without evidence of the extent of use of the marks, have been held to be irrelevant to the strength of a mark or likelihood of confusion.  *See, e.g., National Football League v. Jasper Alliance Corp.*, 16 U.S.P.Q.2d 1212, 1217 n.3 (T.T.A.B. 1990) (holding that trademark search report does not constitute evidence of either the existence of a registration or the use of a mark); *National Steel Products Co. v. Quonset Hut, Inc.*, 211 U.S.P.Q. 820, 823 (T.T.A.B. 1981) (phone book listings); *Charrette Corp. v. Bowater Communication Papers, Inc.*, 13 U.S.P.Q.2d 2040, 2043 (T.T.A.B. 1989) (LEXIS/NEXIS reports).

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

infringement without any evidence of actual confusion. *See, e.g., JouJou Designs, Inc. v. JoJo Ligne Internationale, Inc.*, 821 F. Supp. 1347 (N.D. Cal. 1992) (noting that evidence of actual confusion is not required to show a likelihood of confusion and granting plaintiff's motion for partial summary judgment on the issue of liability for trademark infringement).[18]

Moreover, evidence of actual confusion in the form contemplated by ESO (in which a customer approaches a store clerk and says, "Is this an adidas shoe?") is virtually never found in a case involving initial-interest or post-sale confusion, because in those instances, the confusion does not take place at the time of purchase (thus there is no one present to whom such confusion might be reported). *See, e.g., C.A.E., Inc. v. Clean Air Eng'g, Inc.*, No. 97 C 3264, 2000 WL 28274, at *23 (N.D. Ill. Jan. 10, 2000) ("One reason that a showing of actual confusion is not necessary is because there may be many instances of initial interest confusion that are difficult to document.") Thus, it is not surprising that Ms. Koller claims to have not been made aware of instances of such confusion.[19]

---

[18] The cases ESO relied upon to support its assertion are readily distinguishable from the present case. Unlike this case, in which the Ford Survey constitutes significant evidence of actual and likely confusion, **none** of the plaintiffs in the cases cited by ESO presented **any** evidence (survey or otherwise) of likelihood of confusion. *See Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 639 (9th Cir. 1963) ("There is not one word of evidence as to the impact or effect of the supposed similarity of the products upon the market"); *Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler*, 305 F. Supp. 1210, 1214 ( N.D. Cal. 1969) ("plaintiff has presented no evidence whatsoever . . . that anyone has been confused"); *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) ("Oreck produced no evidence of actual confusion . . . or other indicia of actual confusion"); *Streetwise Maps, Inc., v. Vandam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) ("plaintiff failed to proffer any credible evidence of actual confusion").

[19] Ms. Koller's credibility is highly suspect. First, she has only been senior buyer for the last six months, and was not involved at all with the ESO shoes during the preceding two years in which they were sold by Target. (Koller Dep. at 15-17). Second, the testimony of ACI flatly contradicts her claims of Target's innocence in the design process. Koller claimed that Target never suggests particular designs to its suppliers (Koller Dep. at 25-26). ACI, on the other hand, described in detail how Target had asked it to supply copies of the infringing ESO shoes and made specific design demands (Hardy Dep. at 40-46, 60-61).

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

adidas has presented significant evidence of confusion in the form of the Ford Survey, where (after accounting for survey "noise"), more than **thirty-two percent** of potential customers actually believed the ESO shoes were put out by or with authorization from adidas.  (Declaration and Rule 26 Report of Dr. Gerald L. Ford ("Ford Rpt.") ¶¶ 17-21; Ford Rebuttal ¶¶ 12-14). Despite having received adidas's survey approximately a **year** ago, ESO has conducted no survey of its own purporting to show that consumers are not confused by the ESO shoe.  This is undoubtedly because, in fact, consumers are confused by the ESO shoe.  *See Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985) (noting that when a company with the financial means to do so conducts no survey, it "may give rise to the inference that the contents of the survey would be unfavorable").

Instead, ESO attempts to criticize the Ford survey through the testimony of Robert Klein, a purported "expert" with virtually no qualifications to support his statements.  Mr. Klein's undergraduate degree is in mechanical engineering and he has a master's degree in management. (Klein Dep. at 6).  In his entire career, he has supervised a grand total of **one** likelihood-of-confusion survey.  (*Id.* at 10).  He is not a member of the key professional marketing research associations, he has **never** published an article, book or paper on likelihood-of-confusion surveys, and has **never** given a speech relating to such surveys.  (*Id.* at 24-25, 31-32).[20]  He concedes that he is not an expert in trademark matters or on the issue of likelihood of confusion in trademark cases.  (*Id.* at 38).

Mr. Klein collected no independent survey data in this case (*id.* at 40), and instead merely comments on the format and tabulation of the Ford survey.  The Rebuttal Declaration of Dr. Gerald L. Ford describes in detail why Klein's observations are either completely wrong or do

---

[20] By contrast, Dr. Ford has supervised literally hundreds of likelihood-of-confusion surveys, is a member of all relevant professional associations, is a renowned speaker on the topic, and has published numerous peer-reviewed articles on the subject.  (Ford Rpt., Ex. C; Ford Rebuttal ¶¶ 21-28).

12- REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

not affect the validity of the survey.  In the interest of avoiding a lengthy repetition of the Ford

Rebuttal here, the following chart briefly responds to each of Klein's observations:

| Klein's Observation | Response |
|---|---|
| Ford used a photograph that removed the emboss on the toe cap of the ESO shoe | • In post-sale and initial-interest testing, a photograph is the norm because it is too difficult as a practical matter to control the use of mannequins (Ford Rebuttal ¶ 6)<br><br> • The shell toe emboss was removed because the survey was designed to test the impact of the *stripes* on the ESO shoes (*Id.* n.2)[21]<br><br>• Consumers were permitted to view the photographs "close up" because that gave them the best possible opportunity to see the fourth stripe.  This avoided the need for respondents to "squint or stare" and *reduced* the likelihood of an adidas response.  (*Id.* ¶ 6)[22] |
| Ford population was persons 18 and older who were likely to purchase athletic shoes in the next six months | • Ford used quotas based on widely published census data to conform the sample to the purchaser demographics of athletic shoes.  (*Id.* ¶ 8)<br><br>• Surveys to test consumer confusion almost never include respondents under age 16, and there is no indication or data to support Klein's hypothesis that 17 year-olds would have answered any differently than 18 year-olds.  (*Id.* ¶ 9; Klein Dep. at 106)<br><br>• There is no data to support Klein's assertion that boys and girls under age 18 are the "primary purchasers of athletic shoes"  (Ford Rebuttal ¶ 11).  In fact, the designer of the ESO shoes referred to them as "barbeque shoes" worn by middle-aged consumers.  (Dolinsky Dep. at 70) |
| No separate analysis by age or | • This analysis is unnecessary, given the fact that the ESO |

---

[21] Of course, the Shell Toe feature is such a powerful indicator of source, that even though an effort had been made to remove that feature, it was still mentioned as an indicia of adidas by an appreciable number of consumers.  (Ford Rpt. ¶ 22).

[22] If anything, viewing the ESO shoe from a greater distance would have *increased* the level of confusion because some respondents would not have noticed that there were four stripes instead of three.  (Klein Dep. at 78-79).

13- REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.

[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

| Klein's Observation | Response |
| --- | --- |
| gender | shoes were sold at varying age levels and to both genders. (Esses Dep. at 16-17, 202-203; ESO's Response to Interrogatory No. 4; Ford Rebuttal ¶ 15)[23]<br><br>• The gender and age data were reported by Ford, and Klein simply failed to conduct any analysis.  (Klein Dep. at 122-123) |
| The control shoe had no stripes | • The Ford survey is designed to test the influence of four stripes on a consumer.  Therefore, the control must remove the "active ingredient" -- the stripes.  (Ford Rebuttal ¶ 7)<br><br>• Using the K-Swiss shoe, or another shoe with stripes, as a control could lead to mismeasurement of noise (*Id.*) |
| The test cell interviews were completed before the control interviews | • This is a quality control mechanism.  Practically speaking, when test and control interviews are conducted randomly, it leads to error in the interviewing (because interviewers sometimes mistakenly show the respondent the wrong stimulus).  (*Id.* ¶ 17) |
| Interviewers could have figured out the study was about stripes | • Even if true, because the interviewers did not know who sponsored the survey (they just as easily could have been working for ESO and seeking non-adidas responses), the study was truly double-blind  (*Id.* ¶ 18; Klein Dep. at 45) |
| Ford asked whether the shoe "is or is not put out with the authorization or approval of any other company or companies" | • This is exactly the question that the courts have said is proper to test confusion under 15 U.S.C. § 43(a).  *See Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F. Supp. 232, 247 (S.D.N.Y. 1994); *Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F.Supp.2d 335 (D. N.J. 2002); *see also* McCarthy, *supra*, § 32:175, 32-287 (referring to this question as "often-used, and stating "[r]esponses naming the senior user evidence actual confusion as to sponsorship, affiliation or connection, which is actionable")<br><br>• Also, this question only caused respondents to be coded as confused.  Thus, even subtracting these respondents leads to a significant confusion level.  (Ford Rebuttal ¶ 16) |

[23] ESO's Response to adidas's Interrogatory No. 4 is attached as Exhibit F to the accompanying Feldman Declaration.

14-  REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.

[21184-0009/PA030090.128]

PERKINS COIE LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

| Klein's Observation | Response |
|---|---|
| Ford should have further reduced the 34% net confusion figure from the test cell by the responses in the control cell | • This completely misapprehends the difference between a control *question* and a control *cell*. (Klein Dep. at 14). In the test cell, Ford asked a control question "why do you say that," and counted as confused *only* those respondents who mentioned stripes. In the control cell, Ford subtracted out any respondent who mentioned "adidas" on seeing the shoe that had no stripes. By following this protocol, he ensured removal of *all* "noise" -- or guessing by the respondents -- and, in fact, the dual controls provide independent verification for the survey results. (Ford Rebuttal ¶¶ 12-13)<br><br>• Klein himself could point to no authority for the proposition that one must deduct control cell results from the control question results. (Klein Dep. at 64-65) |
| Ford mistabulated eight responses as confusion when the respondents were not actually confused | • Even if these eight are subtracted, the net confusion level is still in excess of 25% -- significantly *above* the level required by courts to find a likelihood of confusion. (Klein Dep. at 142); *see* McCarthy, *supra*, § 32:188, 32-311 ("Generally, figures in the range of 25 percent to 50 percent have been viewed as solid support for a finding of a likelihood of confusion"). Klein further agreed that a number of "authorization" responses needed to be added back to the confusion column, returning net confusion to the original level reported by Ford. (Klein Dep. at 133-135, 142) |
| The survey does not support initial interest confusion because there's no evidence that the ESO shoes are marketed without hang tags or signs | • Target stores pull the shoes out and display them in profile apart from their boxes, as Dr. Ford witnessed when he personally visited Target stores. (Ford Rebuttal ¶ 19)<br><br>• Target also advertises in circulars, displaying a photograph of the shoes from the side. (Koller Dep. at 117-119, Ex. 5; Koller Decl., Ex. A)<br><br>• Klein admitted that the Target circulars depicted the ESO shoes in a manner "similar" to that in the Ford survey, and that such circulars were intended to generate "initial interest" in the shoes. (Klein Dep. at 80-81) |

15- REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.

[21184-0009/PA030090.128]

**Perkins Coie LLP**
1211 S.W. Fifth Avenue, Suite 1500
Portland, Oregon 97204
(503) 727-2000

In short, Klein's criticisms do nothing to weaken the strength of the Ford survey evidence. This level of confusion is overwhelming, and supports a finding of likely confusion as a matter of law.[24]

## C.    Marketing Channels Are Irrelevant in a Post-Sale Confusion Case

ESO next argues that because adidas shoes are not sold in Target stores, consumers will not be confused.  This argument, however, entirely ignores post-sale confusion.  Amazingly, ESO does not even attempt to distinguish the virtually identical case of *Payless ShoeSource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985 (Fed. Cir. 1993), which rejected the very argument now asserted by ESO.  In *Payless*, the district court had denied Reebok's motion for preliminary injunction on the ground that infringement was unlikely because of "'vast' differences in the manner of marketing and the channels of trade employed by the two companies." *Id.* at 988.  The Federal Circuit held that the district court had abused its discretion, vacated and remanded the case, noting that "by exclusively focusing on confusion at the point of sale, the district court effectively disregarded Reebok's argument relating to 'post-sale confusion.'" *Id.* at 989.  The Court specifically held that differences in marketing channels "are immaterial to the issue whether actionable confusion is likely to occur *after* the marked product has entered the public arena.  For example, post-sale observers may be unaware that Payless and Reebok shoes are sold in different stores or at different prices, yet their confusion may be detrimental to Reebok." *Id.* at 989-90 (emphasis in original).  Similarly, although adidas and ESO shoes are sold at different stores and at different prices, post-sale confusion is likely to occur.

---

[24] *Teaching Co. L.P. v. Unapix Entertainment, Inc.*, 87 F. Supp.2d 567, 590 (E.D. Va. 2000) (survey results of 16% confusion sufficient to prove "actual confusion of the source of origin of these products exists in the marketplace");  *Copy Cop v. Task Printing*, 908 F. Supp. 37, 42 (D. Mass. 1995) (survey showing 16.5% confusion supported plaintiff's motion for summary judgment); *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 890 F. Supp. 1559, 1580 (N.D. Ga. 1994) (finding "inevitable confusion" where survey showed 15-20% of average consumers were confused).

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

**D.    ESO Acted in Bad Faith**

In attempting to deny intentional infringement, it is striking that ESO does not even attempt to deny that its footwear designer based the shoe on another four-stripe imitation of the Superstar.  (Dolinsky Dep. at 83-85).  Nor does ESO deny that its footwear was intended to be a "version" of the Superstar.  (*Id.* at 13; Esses Dep. at 20).  As ESO's 30(b)(6) witness testified:

> Q:    And how long have you known about the Adidas Superstar model?
>
> A:    You got to go back, I don't know, in the '70s, '80s, '70s probably.
>
> Q:    And you recognized that [ESO's Von and Vega shoes] were a version of the Adidas Superstar model, did you not?
>
> A:    Yeah, I can say yes, it's a version of it, but we weren't outright trying to duplicate it.  We would never do that.
>
> Q:    But it's a version; is that correct?
>
> A.    Yes.

(Esses Dep. at 21).  Despite lip-service that ESO wasn't "outright trying to duplicate it," the undisputed facts show that from among "the infinite number of possible marks,"[25] ESO chose a design that was only one strip of cloth away from being an identical copy of the Superstar.

ESO attempts to explain away its conduct by arguing (without citing any evidence) that copying is common in the footwear industry.  However, a "respectable body of authority" recognizes "that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer."  *AMP, Inc. v. Foy*, 540 F.2d 1181, 1187 (4th Cir. 1976); *see also L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1132 (Fed. Cir. 1993) (recognizing this "duty").  Therefore, courts "look with suspicion

_____

[25] *Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1429 (D. Minn. 1989) (conscious decision raises "inference of intent to trade upon the plaintiff's good will"); *see also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1182 (9th Cir. 1988) (finding bad faith when defendant chose similar name out of "entire material universe" of alternatives); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 927 (10th Cir. 1986) ("deliberate adoption of a similar mark may lead to an inference of intent to pass off goods").

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir. 1981); *accord Kroger Co. v. Johnson & Johnson*, 570 F. Supp. 1055, 1059-60 (S.D. Ohio 1983) (junior user found to be intentional infringer when it admitted that its product was designed to be "reminiscent of" the senior user's product).

ESO attempts to explain away its behavior by noting that, after adidas objected, it "modified" the footwear by removing the emboss from the rubber toe cap and by making the stripes with straight edges instead of serrated ones.[26] ESO admitted its reason for the modification was that the original shoes were "too close to adidas." (Esses Dep. at 169). Of course, to the casual observer, the "modified" shoes are virtually indistinguishable from the "original" ESO shoes. As Dr. Ford explains, the modified shoe likely would yield the same high level of confusion as that revealed in the survey using the original shoe. (Ford Rebuttal ¶ 20).

The following side-by-side photographs demonstrate the paucity of ESO's changes to the infringing design:

**"Original" Infringing Shoe**[27]        **"Modified" Infringing Shoe**[28]

----

[26] The removal of serrations does nothing to move away from the adidas Three-Stripe Mark. In addition to the registrations covering serrated stripes, adidas owns a federal trademark registration covering the use of three non-serrated stripes on footwear. *See* U.S. Registration No. 2,278,589.

[27] adidas is concurrently filing the actual shoe depicted here as Exhibit G to the Feldman Declaration.

[28] adidas is concurrently filing the actual shoe depicted here as Exhibit H to the Feldman Declaration.

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

It is well settled that when a defendant comes too close to a mark initially, and it modifies its design in response to an objection from the trademark owner, the infringer has an obligation to distance itself even further to avoid confusion. *See OSEM Food Indus. v. Sherwood Foods, Inc.*, 917 F.2d 161, 163-64 (4th Cir. 1990) (noting that changes to a design during the pendency of the case "make the revised package little other than a copy," because "once a company commits an unfair business practice, it should thereafter be required to keep a safe distance away from the margin line"); *Cyclonaire Corp. v. United States Sys., Inc.*, 209 U.S.P.Q. 310, 315 (D. Kan. 1980) ("Previous infringers of marks have been held to have a greater duty to adopt distinctive marks. . . . Even without a prior infringement, one who adopts a mark similar to the mark of another for closely related goods acts at his peril, and any doubt there might be must be resolved against him."); *Kimberly Knitwear Inc. v. Kimberly Stores Inc.*, 331 F. Supp. 1339, 1341 (D. Mich. 1971) (noting that defendants' change from KIMBERLEYS to KIMLEYS, "while perhaps not confusingly similar, is so reminiscent of the plaintiff's that it continues to accord the defendants some of the same unfair advantage they have previously enjoyed. This they may not do.").

*Chevron Chemical Company v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695 (5th Cir. 1981), is instructive in the application of the "safe distance rule" to the present facts. In *Chevron*, the plaintiff objected to defendant's use of a confusingly similar trade dress on pesticides. Defendant subsequently made three modifications to its packaging in an attempt to move further away from plaintiff, while still maintaining a similar look and feel. Although the court concluded that the second, third, and fourth modifications would not have constituted trade dress infringement standing alone, it required the injunction to bar those designs as well, holding: "A competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line even if that requirement involves a handicap as compared with those who have not disqualified themselves." *Id.* at 705 (quoting *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir. 1930)). Similarly,

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S.
ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE** LLP
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

even if ESO's latest iteration would not infringe adidas's trademarks or trade dress standing alone (which it clearly does), ESO's prior bad faith infringement renders even the modified shoes unlawful.

### III.    CONCLUSION

For the foregoing reasons, as well as those set forth in adidas's initial moving papers, ESO is liable for trademark infringement and unfair competition as a matter of law.  Therefore, adidas's motion for partial summary judgment should be granted, and adidas should be awarded immediate injunctive relief, all profits from the sale of the ESO shoes, attorneys' fees, and costs.

DATED:  January 10, 2003

**PERKINS COIE LLP**


By  /s/ Stephen M. Feldman
      Stephen M. Feldman, OSB No. 93267
      Thomas R. Johnson, OSB No. 01064
      Telephone:  (503) 727-2000

Attorneys for Plaintiffs

Jerre B. Swann, (admitted *pro hac vice*)
William H. Brewster, (admitted *pro hac vice*)
R. Charles Henn Jr., (admitted *pro hac vice*)
**KILPATRICK STOCKTON LLP**
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

Of Counsel for Plaintiffs

20- REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.
[21184-0009/PA030090.128]

**PERKINS COIE LLP**
1211 S.W. FIFTH AVENUE, SUITE 1500
PORTLAND, OREGON 97204
(503) 727-2000

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT E.S. ORIGINALS, INC.** on

Milo Petranovich
Kenneth R. Davis, II
Lane Powell Spears Lubersky LLP
601 SW Second Avenue, Suite 2100
Portland, OR 97204-3158
  Attorneys for Defendants Target Corp.,
  B.U.M. International, Inc. and E. S.
  Originals, Inc.

Martin W. Schiffmiller
Lisa A. Pieroni
Kirschstein, Ottinger, Israel
  & Schiffmiller, P.C.
489 5th Avenue
New York, NY 10017
  Attorneys for Defendant E. S. Originals, Inc.

Vincent H. Chieffo
Frank E. Merideth
Greenberg Traurig LLP
Suite 400E
2450 Colorado Boulevard
Santa Monica, CA 90404
  Attorneys for Defendants Target Corp.
  and B.U.M. International, Inc.

by causing a full, true, and correct copy thereof, addressed to the last-known office address of the attorney or registered agent, to be sent by the following indicated method or methods, on the date set forth below:

| x | by **mailing** in a sealed, first-class postage-prepaid envelope and deposited with the United States Postal Service at Portland, Oregon. |
| --- | --- |
|  | by **email transmission** to petranovichm@lanepowell.com; davisk@lanepowell.com; mws@kirschsteinlaw.com; lap@kirschsteinlaw.com; chieffov@gtlaw.com; meridethf@gtlaw.com. |

DATED: January 10, 2003

**PERKINS COIE** LLP

By  /s/ Stephen M. Feldman
    Stephen M. Feldman, OSB No. 93267
    Thomas R. Johnson, OSB No. 01064
    Telephone: (503) 727-2000
  Attorneys for Plaintiffs

1-  CERTIFICATE OF SERVICE